### STEPHEN SHAY ET AL. *v.* LINDA D'AMARIO ROSSI ET AL.
### (SC 16212)

Borden, Norcott, Katz, Palmer, Sullivan, Vertefeuille and Callahan, Js.

Argued January 12—officially released May 3, 2000*

* May 3, 2000, the date that this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Donald McPartland*, with whom was *W. Fielding Secor*, for the appellants-appellees (plaintiffs).

*Carolyn K. Querijero*, assistant attorney general, with whom were *Michael R. Bullers*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *John E. Tucker*, assistant attorney general, for the appellees-appellants (defendants).

*Opinion*

BORDEN, J. This appeal and cross appeal raise significant issues regarding the meaning and scope of the doctrine of sovereign immunity, and the relationship between that doctrine and General Statutes § 4-165.[1]

---

[1] General Statutes § 4-165 provides: "Immunity of state officers and employees from personal liability. No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter. For the purposes of this section 'scope of employment' shall include, but not be limited to, representation by an attorney appointed by the Public Defender Services Commission as a public defender, assistant public defender or deputy assistant public defender or an attorney appointed by the court as a special assistant public defender of an indigent accused or of a child on a petition of delinquency, representation by such other attorneys, referred to in section 4-141, of state officers and employees, in actions brought against such officers and employees in their official and individual capacities, the discharge of duties as a trustee of the state employees retirement system, the discharge of duties of a commissioner of Superior Court hearing small

More specifically, the appeal and cross appeal raise the following issues, namely, whether: (1) the denial by the trial court of a motion to dismiss on the grounds of sovereign immunity is an appealable final judgment; (2) the trial court properly declined to dismiss the complaint of the plaintiffs against the defendants in their official capacities on the ground that the doctrine of sovereign immunity does not protect them; and (3) the trial court properly dismissed the complaint against the defendants in their individual capacities on the ground that the plaintiffs had not sufficiently established that the defendants did not have immunity under § 4-165.

The plaintiffs, Stephen Shay, Kyle Shay, Kelsey Shay, Maggie Shay and Amelia Shay,[2] appeal,[3] and the defendants, Linda D'Amario Rossi, Carl Graham-Leichner, Robert W. Murphy III and Christine Lupke,[4] cross

claims matters or acting as a fact-finder, arbitrator or magistrate or acting in any other quasi-judicial position, and the discharge of duties of a person appointed to a committee established by law for the purpose of rendering services to the Judicial Department; provided such actions arise out of the discharge of the duties or within the scope of employment of such officers or employees. For purposes of this section, members or employees of the soil and water district boards established pursuant to section 22a-315 shall be considered state employees."

[2] Stephen Shay and Kyle Shay are husband and wife, and are the parents of the three minor plaintiffs, Kelsey Shay, born on January 17, 1991, Maggie Shay, born on May 9, 1992, and Amelia Shay, born on October 14, 1993, for whom the parents are acting in this case as parent and next friend. They are also the parents of the minor child, Charlotte Shay, born on July 13, 1995, who, although a subject of the incidents in question, is not a plaintiff. Except where otherwise indicated, we refer to all of these individuals collectively as the plaintiffs.

[3] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book § 65-1, and General Statutes § 51-199 (c).

[1] At the time of the events in question in this case, Rossi was the commissioner of the department of children and families (department), Graham-Leichner was the program supervisor of the department, Murphy was a social worker in the department, and Lupke was a social work supervisor of the department. All of the defendants were sued in both their official and individual capacities.

appeal[5] from the judgment of the trial court: (1) dismiss-ing the plaintiffs' complaint against the defendants in their individual capacities; and (2) declining to dismiss the complaint against the defendants in their official capacities. In their appeal, the plaintiffs claim that, in response to the defendants' motion to dismiss, they made a sufficient showing that the defendants, in their individual capacities, had acted wantonly, recklessly or maliciously so as to bring their conduct within the exception to the statutory immunity provided by § 4-165. In their cross appeal, the defendants claim that: (1) the denial of a motion to dismiss based on sovereign immunity is a final judgment for purposes of appeal; and (2) on the merits of their cross appeal, the trial court improperly denied their motion to dismiss the complaint against them in their official capacities. We conclude that: (1) the denial of a motion to dismiss based on sovereign immunity is a final judgment for purposes of appeal; (2) the trial court properly denied the defendants' motion to dismiss the complaint against them in their official capacities; and (3) the trial court improperly dismissed the complaint against the defen-dants in their individual capacities. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The plaintiffs brought this fifteen count complaint[6] against the defendants in both their official and individ-ual capacities. The defendants moved to dismiss the

---

[5] The defendants cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the cross appeal to this court pursuant to Practice Book § 4023, now Practice Book § 65-1, and General Statutes § 51-199 (c).

[6] In the various counts of their complaint, the plaintiffs alleged claims for intentional infliction of emotional distress, abuse of process, vexatious litigation, defamation and false imprisonment, as well as violations of their rights under 42 U.S.C. § 1983, and article first, §§ 7 and 9, of the Connecticut constitution. This appeal does not involve the sufficiency of any of these alle-gations.

entire complaint. As to the counts against the defendants in their official capacities, they moved to dismiss on the ground of sovereign immunity. As to the counts against the defendants in their individual capacities, they moved to dismiss on the ground that they were immune under § 4-165. The trial court denied the motion to dismiss the complaint against the defendants in their official capacities, granted the motion to dismiss the complaint against the defendants in their individual capacities, and rendered judgment accordingly. This appeal and cross appeal followed.

I

We first address the procedural posture in which this appeal is presented to us. In their motion to dismiss, the defendants challenged the sufficiency of the plaintiffs' allegations to overcome the doctrines of sovereign immunity and statutory immunity, and also presented certain affidavits that incorporated numerous documents, attached thereto, bearing on the events in question.[7] The plaintiffs did not present any counteraffidavits, did not question the accuracy of the facts stated in the affidavits, and stated at oral argument before this court that, in their view, the affidavits in question simply verified their allegations. Thus, they did not in the trial court, and do not in this court, claim that the affidavits created questions of fact that would have necessitated an evidentiary hearing on the defendants' motion. The defendants claim that, because the plaintiffs have not challenged any of the facts stated in the affidavits, their allegations must be viewed in light of the undisputed facts established by them. The trial court, however, did

---

[7] The affidavits were from Nancy Wilcox-Marchetti, the custodian of the records of department cases in the Danbury regional office, and Graham-Leichner. The documents attached to the affidavits constitute official department records of the incidents in question in this case. Our references to the affidavits include the documents attached thereto.

not advert to the affidavits, and ruled on the motion solely on the basis of the plaintiffs' allegations.

This procedural posture implicates two different lines of cases. One line of cases, applicable to cases in which the parties present a motion to dismiss solely on the basis of the allegations of the complaint, holds that "we examine the pleadings to decide if the plaintiff has alleged sufficient facts: (1) with respect to sovereign immunity, to support a conclusion that the defendant acted in excess of his statutory authority; and (2) with respect to personal immunity under § 4-165, to support a conclusion that the defendant was acting outside the scope of his employment or wilfully or maliciously. [*Gurliacci* v. *Mayer*, 218 Conn. 531, 542, 590 A.2d 914 (1991)]; see *Barde* v. *Board of Trustees*, 207 Conn. 59, 64, 539 A.2d 1000 (1988)." *Antinerella* v. *Rioux*, 229 Conn. 479, 489, 642 A.2d 699 (1994). In doing so, moreover, we construe the pleadings broadly in favor of the plaintiff. Id., 490. The second line of cases holds that "[w]here . . . as here, the motion is accompanied by supporting affidavits containing undisputed facts, the court may look to their content for determination of the jurisdictional issue and need not conclusively presume the validity of the allegations of the complaint. *Garden Mutual Benefit Assn.* v. *Levy*, 37 Conn. Sup. 790, 791, 437 A.2d 141 (1981)." *Barde* v. *Board of Trustees*, supra, 62; see Practice Book § 10-31.[8] Both lines of

---

[8] Practice Book § 10-31 provides: "—Grounds of Motion to Dismiss.

"(a) The motion to dismiss shall be used to assert (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, and (5) insufficiency of service of process. This motion shall always be filed with a supporting memorandum of law, and where appropriate, with supporting affidavits as to facts not apparent on the record.

"(b) Any adverse party who objects to this motion shall, at least five days before the motion is to be considered on the short calendar, file and serve in accordance with Sections 10-12 through 10-17 a memorandum of law and, where appropriate, supporting affidavits as to facts not apparent on the record."

cases, however, are premised on the further principle that, although allegations of fact are to be read broadly in favor of the plaintiff, allegations that state conclusions of law are not given such presumptive validity. See *Barde* v. *Board of Trustees*, supra, 65–66; *American Laundry Machinery, Inc.* v. *State*, 190 Conn. 212, 217, 459 A.2d 1031 (1983).

In the present case, the defendants accompanied their motion to dismiss with affidavits the contents of which the plaintiffs do not dispute. There are certain allegations in the complaint, however, discussed in more detail in part II of this opinion, which, although disputed by the defendants in their brief in this court, either were not specifically contested or were not addressed in their affidavits. Under these circumstances, therefore, we read the factual allegations of the plaintiffs' complaint tempered by the light shed on them by the defendants' affidavits. With respect to those factual allegations, however, that were not disputed by those affidavits either directly or by implication, we construe them broadly in the plaintiffs' favor and presume them to be true for purposes of the motion to dismiss.

## II

With this procedural posture in mind, we turn to those facts that are undisputed for purposes of the motion to dismiss, as disclosed by the allegations of the complaint and the affidavits. Those facts are as follows.

On the morning of February 14, 1996, Kyle Shay tripped and fell at her home, in the town of New Milford, while holding Charlotte Shay, her youngest child, who was then approximately seven months old and was breast-feeding. Concerned that Charlotte might have been injured in the fall, Kyle called her family pediatrician, Diane M. D'Isidori, who recommended that Kyle take Charlotte to the New Milford Hospital emergency

room. D'Isidori also telephoned the emergency room to advise that Kyle and Charlotte were on their way, and that there should be no concern about child abuse. Kyle immediately drove Charlotte to the emergency room, where she was admitted at 8:30 a.m. At the emergency room, Charlotte was treated by the attending physician, Edouard Tavernier, who confirmed that she had a nondisplaced fracture of the left femur, with no evidence of additional fractures.

At 2:17 p.m., in a facsimile transmission to the state department of children and families (department), Tavernier reported Charlotte Shay's injury as a suspected case of child abuse. In his telephone report, he indicated that Kyle Shay's statement that she had fallen while holding Charlotte, who had a broken left femur with no other bruises or abrasions, led him to be suspicious of Kyle's statement. A skeletal survey of Charlotte was negative for other injuries. Tavernier also stated that the hospital records disclosed an extensive history of admissions for the other children, namely: on February 25, 1995, then two year old Amelia Shay reportedly had bumped her head on a table, and on April 15, 1994, she was "run over by [a] garden tractor"; and on July 17, 1995, then three year old Maggie Shay "ingested poison," on October 20, 1994, she "had a Tylenol overdose," and at one year of age, she had a laceration on her chin. The department records disclosed no prior involvement with the family.

The department called the New Milford police department, which sent an officer to investigate. At 2:45 p.m., the case was assigned to Murphy, and at the same time Graham-Leichner executed and delivered to Murphy an "Immediate Removal/96-Hour Hold of Child(ren)" pursuant to General Statutes (Rev. to 1995) § 17a-101

(e).[9] Graham-Leichner was authorized by Rossi to issue

[9] General Statutes (Rev. to 1995) § 17a-101 (e) provides: "Agencies or institutions receiving reports of child abuse as provided in this section shall, within twenty-four hours, transfer such information to the commissioner of children and families or his agent, who shall cause the report to be investigated immediately, except that if the report concerns a school employee who is suspected or believed to be responsible for the injuries or maltreatment, the superintendent or supervisory agent, with the assistance of the department of children and families, if requested by the superintendent or supervisory agent, and the local police department or state police shall immediately investigate the report. If the investigation produces evidence that the child has been abused in the manner described in subsection (b), he shall take such measures as he deems necessary to protect the child, and any other children similarly situated, including but not limited to: (1) Immediate notification by the commissioner of children and families or his designee of the appropriate law enforcement agency or agencies; (2) the removal of the child or children from his home with the consent of his or their parents or guardian or by order of the superior court; and (3) if an investigation by a superintendent or supervisory agent produces evidence that a child has been abused by a school employee, the superintendent or supervisory agent shall immediately notify the child's parent or other person responsible for the child's care, the local police department or state police, the commissioner of children and families, or his representative, and, in the case of an investigation of a certified school employee, the commissioner of education, or his representative, and if an investigation by a local police department or state police produces evidence that a child has been so abused, such department or state police shall immediately notify the child's parent or other person responsible for the child's care and the superintendent of the school district or the supervisory agent of the nonpublic school in which the school employee is employed and, in the case of an investigation of a certified school employee, said superintendent shall immediately notify the commissioner of education, or his representative. Notwithstanding any provision of the general statutes to the contrary, whenever an investigation pursuant to this subsection produces evidence that a child has been abused by a certified public school employee in a position requiring a certificate, the superintendent may suspend such school employee. Such suspension shall be with pay and shall not result in the diminution or termination of benefits to such employee. Within seventy-two hours after such suspension the superintendent shall notify the local or regional board of education and the commissioner of education, or his representative, of the reasons for and conditions of the suspension. Any decision by the superintendent concerning such suspension shall remain in effect until the board of education acts pursuant to the provisions of section 10-151. If the contract of employment of a certified school employee is terminated as a result of an investigation pursuant to this subsection, the superintendent shall notify the commissioner of education, or his representative, within seventy-two hours after such

such holds. This document, which was signed by Graham-Leichner, as the department program supervisor, and Murphy, as a department social worker, was addressed to Kyle Shay and Stephen Shay, and stated that, pursuant to § 17a-101 (e), the department had determined that, for Charlotte Shay's safety and well-being, the immediate removal of Charlotte from their home and custody was necessary by way of a ninety-six hour hold. The reason given was as follows: "Charlotte has sustained a broken left femur. Physician is

termination. Upon receipt of any report required pursuant to this section, the commissioner of education may commence certification revocation proceedings pursuant to the provisions of subsection (m) of section 10-145b. Notwithstanding the provisions of sections 1-19 and 1-19a, information contained in reports received by the commissioner of education, or his representative, pursuant to this section shall be confidential subject to regulations adopted by the state board of education under section 10-145g. If the commissioner of children and families or his designee, after such investigation, has probable cause to believe that the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings, and that immediate removal from such surroundings is necessary to insure the child's safety, the commissioner, or his designee, may authorize any employee of his department or any law enforcement officer to remove the child from such surroundings without the consent of the child's parent or guardian. During such period of temporary custody, the commissioner or his designee may provide the child with all necessary care, including medical care, which may include an examination by a physician with or without the consent of the child's parents, guardian or other person responsible for the child's care. During the course of such an examination, a physician may perform diagnostic tests and procedures necessary to the detection of child abuse. Such removal and temporary custody shall not exceed ninety-six hours during which time either a petition shall be filed with the superior court or the child shall be returned to his parent or guardian. If the commissioner determines that there are grounds to believe the child may be properly cared for in his own home, the parents or guardian, as the case may be, shall be aided to give such proper care under the supervision of the commissioner. Such supervised custody may be terminated when the commissioner finds a safe environment has been provided the child; but if the commissioner, after a reasonable time, finds this condition cannot be achieved in the child's own home under such supervision, he may petition the superior court for commitment of the child."

General Statutes (Rev. to 1995) § 17a-101 (e) was repealed by Public Acts 1996, No. 96-246, § 1.

suspicious of explanation. Hospital has extensive record of admissions on siblings. Charlotte is in need of immediate protection [and] safety." The document also stated that the law allowed the department to hold the child for up to ninety-six hours, during which time an assigned social worker would contact them, and it listed certain department telephone numbers to call.

At 3:35 p.m., on the same day, Murphy went to the hospital and met with Tavernier to investigate his report of suspected abuse of Charlotte Shay, and to get a clarification of the reported concerns and of the admissions of Charlotte's siblings. Murphy asked for a written statement from Tavernier, and was told that he would receive it before leaving the hospital.

At 3:50 p.m., Murphy met with Kyle Shay, Charlotte Shay, and the hospital social worker. Murphy gave Kyle a department informational pamphlet and briefly discussed its contents with her. Kyle then told Murphy her version of how the incident had occurred. She stated that she and the children were in her bed and, as she attempted to get out of the bed holding Charlotte, who was in her arms and looking over Kyle's shoulder, she attempted to sidestep between Charlotte's crib and the bed when she twisted her ankle, causing her to fall. As she was falling, Kyle turned the baby to face forward and extended the baby away from her body so that she would not fall on the baby. Charlotte fell about two feet to the carpeted floor and landed on all fours, bumping her head. Kyle and Stephen Shay did not realize until later that Charlotte was hurt more than they first believed. They then called Evan Hack, a pediatrician who is the husband and an associate of D'Isidori, who referred them to the hospital emergency room.

Murphy then requested that Kyle Shay have Stephen Shay bring the other three children to the hospital for examination. Kyle agreed to do so, and they arrived

approximately twenty minutes later. Kyle told Murphy that Officer John DiGiovanni of the New Milford police department had investigated and had stated that no further action would be taken. Murphy then met with Tavernier, who gave him a written statement that, in his opinion, the injury sustained by Charlotte Shay and Kyle's version of the incident were inconsistent.

Murphy then met with the hospital social worker in her office and gave her copies of the ninety-six hour hold and Tavernier's statement. Murphy asked the social worker to inform the head nurse on the pediatric floor of the hold and that the department did not want Kyle Shay to leave the floor with Charlotte Shay.

At 5 p.m., while the other children were in the emergency room to be examined by Tavernier, Murphy met with Stephen Shay and asked him about the incident. Stephen stated that he had been in another room when he heard Charlotte Shay cry, and that his knowledge of how the injury had occurred was based on what his wife had told him. Stephen stated that they were good parents, "maybe even overprotective," and that he had no concerns regarding any abuse or neglect. He also denied any alcohol or substance abuse, any domestic violence or arrests regarding anyone in the home, any mental health issues, and any past involvement with the department.

Murphy then questioned Stephen Shay regarding the prior emergency admissions of Amelia Shay and Maggie Shay. According to the hospital records, these were as follows. Amelia had been seen at the emergency room three times: (1) on February 25, 1995, for ingestion of phenylbutizone, a horse aspirin painkiller;[10] (2) on January 31, 1995, for a contusion on the head; and (3)

---

[10] A subsequent home visit disclosed that the Shays' home was on a twelve acre tract of land that included a barn for a horse, which the family considered to be a pet.

on April 15, 1994, after having been run over "by a riding mower garden tractor." Maggie had been seen at the emergency room three times: (1) on July 17, 1995, for ingestion of poisonous mushrooms; (2) on October 20, 1994, for a Tylenol overdose; and (3) on April 14, 1994, for a laceration to her chin.

Stephen Shay explained these incidents as follows. With respect to the phenylbutizone ingestion, Stephen had put the substance in a cabinet so that it would not go bad, and Amelia Shay was later caught with the powder around her lips. The Shays did not know if or how much she had ingested and, therefore, they took her to the hospital. With respect to the head contusion, Amelia had fallen and hit her head on a table in the home. With respect to the garden mower incident, the Shays were at his mother's home doing yard work when Stephen heard a scream and saw Amelia in the path of the mower. A cousin had rolled the mower out of the garage, put it into neutral and pushed it down the sloping driveway. Despite the number of adults present and Stephen's best efforts, Amelia was run over by the mower and was on the ground beneath it. He ran across the yard, jumped a fence and threw the mower off of Amelia's body. With respect to the mushroom poisoning, while the children were on a picnic in the family's backyard, Maggie Shay put a mushroom or mushrooms in her mouth and was brought to the hospital. Stephen did not recall either the Tylenol overdose incident or the laceration to Maggie's chin, and he stated that Murphy should question Kyle Shay regarding them. According to Stephen, Hack was consulted on all of these incidents and he recommended that the children be seen at the hospital for them.

While Murphy was talking to Stephen Shay, D'Isidori and Hack returned a telephone call that Murphy previously had placed to them. They reported no concerns of abuse or neglect and stated that, if anything, the

parents were overprotective of the children. Hack confirmed that he was aware of all of the emergency room visits by the children. D'Isidori reported that the skeletal survey of Charlotte for older breaks was negative.

Kyle Shay then told Murphy about the other two incidents. With respect to the Tylenol incident, she was tending to a sick child and put the other children to bed one night. The next morning, the children awoke before her, and Maggie Shay found the Tylenol bottle and may have taken some pills. The parents rushed her to the emergency room. According to Kyle, the laceration was from a simple fall.

At 5:22 p.m., Murphy met with Monique Shay, the children's paternal grandmother. She vehemently denied any abuse or neglect, and described the Shays as devoted and loving parents. She confirmed Stephen Shay's account of the lawn mower incident, which she had witnessed, and stated that there were approximately six other adults who could confirm Stephen's account. Murphy then met with Tavernier, who stated that Charlotte Shay's siblings were all in good health. Tavernier reiterated that the fracture of Charlotte's femur was inconsistent with Kyle Shay's version of how it had happened.

Murphy then met with Kyle Shay and Stephen Shay, and told them that based on Tavernier's written and oral reports, the department would be invoking a ninety-six hour hold and placing Charlotte Shay in foster care as soon as she was medically cleared for release from the hospital. Murphy told the Shays that "the matter was out of his hands," that Graham-Leichner had issued the hold, and that upon her release from the hospital, Charlotte would be placed in foster care for up to ten days.

Kyle Shay went downstairs to confront Tavernier, and Stephen Shay went to call an attorney. Tavernier

then returned to the emergency room, took his written report and, in the presence of the Shays, altered his statement regarding his previous opinion of inconsistencies between Charlotte Shay's fracture and Kyle's version, by inserting the word "possible" before "inconsistencies." Tavernier also stated his concern about the department removing Charlotte from her mother, and he objected to the hold. Tavernier then telephoned Hack and informed him of the situation. Hack spoke to Murphy, stating that Charlotte was not to be removed from her mother because she was breast-feeding. Hack and D'Isidori heatedly told Murphy that they would not release the child from the hospital in the face of the hold, and requested that department supervisors contact them directly the next day.

The next morning, at 10:20 a.m., on February 15, 1996, Murphy received a telephone call from Officer DiGiovanni, who confirmed that he had investigated the matter and that he was closing the case after speaking to Hack because he saw no evidence of abuse. At 10:30 a.m., a meeting of department managers and supervisors was held. It was determined that the department would revoke the hold if: the four doctors involved— Hack, D'Isidori, Tavernier and Cameron C. Brown[11]— issued written statements that they had no concerns regarding abuse or neglect; the family agreed to cooperate with the family preservation unit of the department; and the family understood that the department would nonetheless be filing neglect petitions with the Superior Court.

A number of other things happened on February 15, 1996, the precise order of which cannot be determined

---

[11] The department report refers to this physician's name as Black, which we understand to be a mistake. As we indicate in the text of this opinion, Charlotte Shay's fracture actually was treated orthopedically on February 14, 1996, at the hospital, not by Tavernier, but by Brown, a physician associated with New Milford Orthopedic Associates, P.C. On February 15, 1996, Brown issued the statement described in the text.

from the allegations and the affidavits. Kathleen Sidoti, a department social worker, contacted physician John Gundy, a department pediatric consultant, who informed Sidoti that it was possible for a child to sustain a fracture in the manner reported by Kyle Shay. Gundy referred to a study by a physician at Yale, which indicated that a child can even receive a spiral fracture by falling in that manner. In addition, Sidoti went to Kelsey Shay's day care, where she was informed that Kelsey had been in that day care since September, 1995, that Kyle dropped her off and picked her up daily, that there were no abuse or neglect concerns, that Kyle acted appropriately with all of the children, and that Kelsey exhibited no behavioral problems.

Also, Sidoti again spoke with Gundy, who had spoken with Hack. Gundy reported that Hack, who had known the family for years, had no concerns regarding abuse or neglect of any of the children. Hack had reported that the degree of concern by the parents for their children was demonstrated by the fact that during the previous year one of the children had a hemangioma,[12] and the entire family took that child to Boston Children's Hospital once each month. Hack also had reported to Gundy that, on the morning of the accident, Kyle Shay had called D'Isidori and had stated that she thought that Charlotte Shay had a broken leg, and that D'Isidori advised her to take the child to the emergency room. Gundy described the injury as a transverse fracture at the end of the femur. Hack had consulted with the treating orthopedic surgeon, Brown, and Hack stated that there were no abuse concerns. Gundy stated that "the kid should not be removed because it would

---

[12] "Hemangioma" is defined as "[a] congenital anomaly, not actually a true neoplasm, in which a proliferation of vascular endothelium leads to a mass that resembles neoplastic tissue; it can occur anywhere in the body but is most frequently noticed in the skin and subcutaneous tissues." Stedman's Medical Dictionary (24th Ed. 1982) p. 626.

be overkill." Hack also reiterated to Gundy that the child needed to continue breast-feeding and would be at risk of infection if breast-feeding were to cease. Hack also stated that the injury and Kyle's explanation were consistent with each other.

At approximately noon, on February 15, 1996, Kyle Shay telephoned the department and spoke to Lupke, who informed Kyle that "she . . . couldn't handle four kids and that two should be in foster care," and that the department would go forward with the ninety-six hour hold. Also, on the same day, Murphy completed a department "Referral/Intake Form" stating that all four of the Shay children were the subjects of "severe neglect" and should be removed from the home unless family preservation services were provided. This request was communicated to Kyle and Stephen Shay by department staff.

On the afternoon of February 15, 1996, as a result of the pleas of Hack, D'Isidori, Brown and Gundy, and after discussions with a state of Connecticut assistant attorney general initiated by the plaintiffs' attorneys, Graham-Leichner, Murphy and Lupke agreed to revoke the hold regarding Charlotte Shay, and to refrain from pursuing orders for temporary custody on the other three children, provided that: (1) the Shay family agreed to accept and participate in the department intensive family preservation programs; (2) the department receive written statements from Hack, D'Isidori and Brown that they were aware of the previous emergency room admissions and that they had no abuse or neglect concerns for any of the children; and (3) the department receive a written statement from Tavernier that clarified his change of mind about his initial report and that stated his conviction that he no longer had concern that Charlotte was neglected or abused. That day the four physicians made the requested written statements. Although the statements varied in emphasis and tone,

they shared certain common characteristics, namely, that there had been no abuse or neglect and that none of the children, including Charlotte, should be removed from the home.[13]

---

[13] Hack's statement provided as follows:

"Dear [Department] Staff,

"Charlotte Shay (DOB 7/13/95) was admitted to New Milford Hospital on 2/14/96 with a left leg fracture. A [department] referral was made by the New Milford Hospital Emergency Room Staff. I am the primary care provider for all of the Shay children. I have known the family since 1992. All of the children are in excellent health and are up to date on immunizations. Sick calls and visits to my office for illnesses have all been appropriate. I was aware of and involved in emergency room visits in question regarding ingestions and head trauma. I felt that mom informed me in a timely manner and I was able to coordinate care and appropriate follow up. Neither in the past nor at present have I ever been concerned about any abuse or neglect regarding the Shay children. I do not feel at this time that the children are in any immediate danger in the home environment. . . ."

D'Isidori's statement provided as follows:

"Dear [Department] Staff:

"I am writing to you in regard to Charlotte Shay, 7 month old daughter of Kyle & [Stephen] Shay. I admitted Charlotte to New Milford Hospital on February 14th after an evaluation in the Emergency Room for a femur fracture. At the time, the Emergency Dept. physician felt a [department] referral was necessary because of the nature of the injury. On my admission exam, I found Charlotte to be healthy, clean and without signs of any other injury. Although I am not Charlotte's primary care physician, I have cared for her and the other three Shay children on many occasions and have never had any concerns about their well-being. They are brought in appropriately for sick visits and my instructions are always carried out. I am aware of the other Emergency Room visits in question and in each case our office was notified appropriately by the parents.

"At this time, I have no concerns for the welfare of any of the Shay children, and feel they are in no immediate danger in their present home environment. . . ."

Brown's statement provided as follows:

"Dear Dr. Gundy & Assoc.

"I treated Charlotte Shay for a femur fx on 2-14-96. I am aware of the past medical records of the family as told to me by Mrs. Lillis RN. There was *No* skin injury associated with the fracture and the break was not a spiral fracture but a minimally displaced transverse fracture. I agree with close follow-up at the home but am not convinced that there was neglect or abuse. . . ." (Emphasis in original.)

Tavernier's statement provided as follows:

"[Department] . . .

The department received these four written statements on February 16, 1996. On that same day, Kyle Shay and Stephen Shay signed a service agreement with the department, the stated purpose of which was "to achieve the goal of: preservation of the family unit,"[14] by virtue of which the Shays agreed to in-home counseling, and the acceptance of family preservation services from the department and Catholic Family Services for four months. The Shays, however, did not sign this agreement willingly, but viewed it as "an extortionate

"re: Charlotte Shay

"I am in consent with Drs. Hack, Gundy in that I feel that Charlotte Shay should *Not* be taken from her parents. I am *Not* an orthopedic specialist, and the injuries sustained may possibly have occurred in the manner stated by the parents. I do feel that [the department] should explore the home situation. However, taking Charlotte and/or her sisters from the home is wrong and will testify as such. This case is one in which both parents are reliable, employed and will comply.

"Yes the visits by Charlotte and her sisters are suspicious; however *NONE* of the children appear to show any signs of abuse. Perhaps it is simply that more active supervision is needed. Removing any of the children could have devastating results. The *family* is important, as is the child. . . ." (Emphasis in original.)

[14] The department service agreement provided as follows:

"This agreement is between Kyle and Stephen Shay and Bob Murphy of the Department of Children and Families.

"The purpose of this agreement is to spell out in clear, understandable terms the responsibilities that each of the above-named persons have in creating the conditions that must exist to achieve the goal of: preservation of the family unit.

"The terms of this agreement are as follows:

"1. We, Kyle & Stephen Shay, agree to cooperate with [the department] and Catholic Family Services in-home counseling.

"2. We, Kyle & Stephen Shay, agree to communicate openly & often with our [department] worker.

"3. [The department] agrees to communicate with and meet with the family as per policy & schedule allows.

"4. [The department] will revoke the 96 hr. hold under the condition that the family accepts Family Preservation services.

"5. [The department] will still be filing neglect petitions at [the Superior Court for Juvenile Matters] due to concerns over lack of supervision.

"This agreement will begin immediately and end on 6/16/96, at which time this case will be reviewed. . . ."

condition precedent to revoking the hold," upon which Rossi and Murphy "insisted."[15] On that same day, Murphy admitted to Kyle and Stephen that the case was "a major screw-up," that Tavernier had "goofed," that "a big mistake had been made here," and that "if the custody order had been implemented you could sue."[16] The department immediately instituted in-home counseling with a program known as intensive family preservation, through Catholic Family Services.

On the same day, February 16, 1996, Rossi, as commissioner of the department, and Graham-Leichner, as her agent, filed a neglect and abuse petition regarding Charlotte Shay with the Superior Court. This petition alleged that Charlotte was neglected and abused in that she "is being denied proper care and attention, physically, educationally, emotionally or morally and is being permitted to live under conditions, circumstances or associations injurious to her well-being and has been abused, as she has had injuries which are at variance with the history given." In support of these allegations, the petition stated: "Charlotte Shay sustained a broken left femur. Attending physician reported suspicion as to how injury occurred as injury/history given inconsistent. Hospital has extensive history of [emergency room] visits on siblings, Charlotte Shay was seen as being in need of immediate protection and safety due to negligence and accidents." Rossi and Graham-Leichner filed simultaneous neglect and abuse petitions regarding Amelia Shay, Maggie Shay and Kelsey Shay. Each of these petitions repeated the allegations that "[s]aid

---

[15] This view of the conditions under which the Shays signed the department service agreement is taken from their allegations. This is one of the examples in which the allegation is not conceded by the defendants, but which was not specifically addressed by them for purposes of the motion to dismiss. For purposes of this appeal, therefore, we presume the allegation to be true.

[16] We treat these allegations of the plaintiffs similarly to those regarding the conditions under which the Shays signed the department service agreement. See footnote 15 of this opinion.

child is being denied proper care and attention, physically, educationally, emotionally or morally and is being permitted to live under conditions, circumstances or associations injurious to her well-being and has been abused . . . ."[17] In support of these allegations, each petition stated that "[t]his child is a sibling of children who were seen repeatedly for emergency room visits due to accidents because of poor supervision." On the same day, the ninety-six hour hold regarding Charlotte was revoked, and Hack and D'Isidori released her from the hospital.

On February 20, 1996, Murphy wrote to Kyle Shay and Stephen Shay advising them that the department had concluded its investigation and was transferring the case as of that date to the protective services unit of the department "due to the confirmation of the neglect report, based on statements by the involved collaterals and interviews with family members." This transfer was documented internally by the department on February 23, 1996. Murphy and Lupke filed a case disposition summary, which stated: "Baseline risk is high due to report from New Milford Hospital of an injury at variance with the history given by the mother. The report also raises concern over the extensive history of visits by the siblings (four children five and under in the home) to the New Milford Hospital emergency room. Report of neglect confirmed based on interviews with the hospital, collaterals and family." In the assessment summary portion, this document stated: "Overall risk is high due to the age of the children in the home and the reported and substantiated concerns over a lack of

[17] The neglect and abuse petition also alleged, with respect to each of these children, that "*she has had injuries which are at variance with the history given.*" (Emphasis added.) Of course, none of the other children was reported as having any injuries at variance with any histories given regarding them. We read this allegation, therefore, as simply an inadvertent repetition of the identical allegation contained in the neglect and abuse petition regarding Charlotte Shay.

appropriate supervision of the children in the home.
. . . Statements by the doctors report the need for
assessment of the home environment." The document
recommended: "Case transfer as high risk to protective
services due to age of children and neglect confirma-
tion. Neglect petitions already filed (social study needs
to be done). [Intensive family preservation] already in
the home per a [department] referral."

The case had been assigned to family preservation
and reunification program therapist Armand Coullet, of
Catholic Family Services. The department case activity
note of February 29, 1996, indicates that department
social worker Sergio Alvarez "[s]poke with Holly
Shardan of [intensive family preservation]. She said that
Armound was sick and would not be in today. Ms.
Shardan said that there was no abuse in the home and
that [intensive family preservation] might be closing
the case in a few weeks." On March 6, 1996, Coullet
informed Alvarez "that he has been working with the
family for a few weeks and does not see any reason to
stay involved with the family. He thinks that the family
is over protective." On the same day, Coullet also
reported to Alvarez that the Shays were upset by having
received the neglect and abuse petitions in the mail,
and were afraid to take the children to the emergency
room for fear of being accused of neglect or abuse.
Coullet also reported to both Alvarez and Carmen Pol-
lack, Alvarez's supervisor, that he felt that the depart-
ment was traumatizing the family and that he saw no
problems in the home.

Also on March 6, 1996, Alvarez made a home visit,
which disclosed the following. The home was a spa-
cious ranch style contemporary home, was clean and
well kept, the cabinets had locks on them to safeguard
their contents, and Alvarez noticed no safety hazards
to the children. All four children were safe and healthy,
and Charlotte Shay's cast had been removed. The three

older girls shared a bedroom, and Charlotte slept in a crib in her parents' room. Where the accident had happened, the floor was made of cement covered by a thin layer of carpet.

When, in response to the Shays being upset over the allegations made in the petition, Alvarez explained those allegations, Kyle Shay explained the incidents as follows. When Amelia Shay had been taken to the emergency room for ingestion of the horse aspirin pain-killer, and Maggie Shay for ingestion of the mushrooms and Tylenol, the children had not really eaten the substances in question but they had been taken to the hospital as a safety precaution. Similarly, when Amelia was run over by the garden tractor, she sustained only a small bruise but was taken to the emergency room to ensure that she was all right.

When Alvarez told them that the department was concerned over the lack of supervision, the Shays responded that they supervised their children at all times and that the incidents in question were accidents. Kyle Shay stated that she does not work so that she could be with her children. When Alvarez recommended a parent aid to help her with caring for her children, she responded that a girl comes into the home on Saturdays to help her with them. A second home visit on March 13, 1996, confirmed that the children were safe and healthy.

On March 14, 1996, a meeting was held at the department attended by various department personnel, including Shardan, Pollack and Alvarez, and Coullet from Catholic Family Services. Coullet stated that he felt the children were safe, that he saw no reason to be in the home, and that he would be closing his file. They addressed the "lack of supervision," and discussed the possibility of Kyle Shay obtaining counseling or hiring a nanny in the home to "help . . . deal with the stresses

of caring [for] four children that are five years old and under." They agreed to continue with the neglect petitions until further evaluation was done in the home and until the court decided whether the department had valid reason to be involved. Coullet agreed to write his termination summary before the court date for the petitions.

Coullet's termination summary, which noted the intake date as February 16, 1996, and the termination date as February 27, 1996, contained the following information. Kyle Shay is a homemaker and Stephen Shay is an officer in the Norwalk fire department. Their home is on twelve acres of land, which includes a barn used to keep a horse. The house is tidy and clean. Coullet described the prior emergency room admissions as follows: (1) "ingested mushrooms from the lawn"; (2) "ingestion of 2 1/2 Tylenol"; (3) "suspicion of the ingestion of a horse tranquilizer"; (4) "one child pushing a lawn tractor (motor not running) into one of the other children"; and (5) "one instance of a cut chin." The statement further provided: "The accidents occurring to these children are arguably well within the spectrum of 'normal' childhood occurrences. On all occasions, it was the parents who took the children to the [emergency room]. And, fortunately, there was no harm done: there was no poisoning from the mushrooms, or the horse tranquilizer, no bones broken from the bump by the lawn mower; the cut on the chin required no surgery." Coullet also noted that "[b]oth the [department] worker and [he] inspected the area where the fall with the child is said to have taken place. One could certainly trip and fall in that small area which is between the crib and the bed. Furthermore, although the floor is carpeted, the carpet is over concrete." Coullet described the family as "a strong one as evidenced by the positive interaction that obtains among them." He noted that the "extended family of each parent live

nearby and are actively supportive of the Shay family." Coullet recommended a psychological evaluation of both parents "in order to substantiate their parental viability," and that Kyle Shay "give serious consideration to making use of the family resources to gain some respite. Parenting four toddlers is highly stressful and demanding, and always requires sound judgment and vigilance." He concluded that "[d]espite the presence of red flags occasioned by the broken femur and subsequent inspection of the hospital records, no evidence of pathology was found within this family and it appears that they are not neglectful of their children."

On March 15, 1996, Alvarez met with assistant attorney general Carolyn Signorelli, who recommended that the petitions be "kept on file" and that the department go to court as scheduled. They agreed that it was necessary to secure Coullet's termination summary before the court date, and that on that date the department would ask to continue the case. A case status conference would then be scheduled, and if after an additional month "no more injuries or referrals are received, the possibility of dropping the petitions exists."

Thereafter, the defendants directed the department to prepare a family treatment plan, which Alvarez and Pollack filed on March 22, 1996. This plan recited much of the relevant history of the case, and noted that the "children's pediatricians and the [intensive family prevention] worker report no concerns of abuse or neglect." As "strengths of the family," the treatment plan noted that the "[m]other stays home with the children while her husband works. She is the primary caretaker of the children. Father has a secure job and the mother has good house keeping standards." As "weaknesses of the family," the treatment plan noted a "[p]ossible lack of supervision of the children resulting in frequent visits to the emergency room." The treatment plan proposed that the parents, for the next three month

period, ending on June 22, 1996: (1) ensure the children's health and safety; (2) cooperate with department and "other agencies assigned to help the family"; (3) follow department and intensive family prevention recommendations; and (4) provide proper supervision to the children.

The neglect petitions came before the court on March 27, 1996. Kyle Shay and Stephen Shay appeared with their attorney and demanded that the petitions be dismissed. Rossi opposed dismissal, and filed a social study dated the same day, signed by Alvarez, Pollack, and Nancy Wilcox, the department program supervisor. This social study recited the reasons for Tavernier's original referral to the department on February 14, 1996, the signing of the ninety-six hour hold on the same day, and its revocation on February 16, 1996, "based on written statements by . . . Tavernier and the children's pediatricians stating that they had no concerns for the welfare of the children in their home environment." The social study also described the children as healthy, and as both physically and mentally appropriate for their ages. It described the current family situation in the following terms: the family has cooperated with the department and the intensive family prevention therapist; the focus of the intervention "was to address the possible lack of supervision resulting in the children getting hurt and to assess the children's health and safety in the home"; and "[a]fter several weeks in the home, the [intensive family prevention] therapist found no evidence of pathology within the family and stated that it appeared that the parents were not neglectful of their children." The social study described the strengths of the family as follows: "Stephen and Kyle Shay appear to be very close to their children. They claim to love and care for them. [Kyle] Shay is a homemaker and spends all of her time caring for her children. The Shays also have family support from their parents

and siblings." The social study described the weaknesses of the family as follows: "[Kyle] Shay is the primary caretaker of all four children and may become stressed and overwhelmed. Parenting four toddlers can be a stressful and demanding responsibility." The study also noted that "[w]ritten statements from the [emergency room] doctor and the children's pediatricians stating that they had no concerns of abuse and neglect were accepted to prevent placement," and that the "[n]ext treatment plan due date is on 6/22/96." The social study concluded by recommending that all four children "be placed under protective supervision by [the department] for a period of six months," with the following expectations: (1) a psychological evaluation of both parents "in order to substantiate their parental viability"; (2) both parents to maintain constant communication with the department; and (3) both parents to use family or other resources "in order to gain some respite with the care of the children." The court did not dismiss the petitions, and continued the proceedings.

On the same day, March 27, 1996, Alvarez told Kyle Shay that he would be going to the house once a week to see how the children were doing. In addition, Signorelli told Alvarez "that there was not much to go to trial for because [the department] does not have a strong case," and recommended that before April 10, the department decide whether to withdraw the petitions or go to trial.

On April 2, 1996, Pollack told Alvarez that she had been told that "per an administrative decision by central office, we were to withdraw the neglect petitions and close the case," and that she was to notify Signorelli of that fact. On April 11, 1996, the department closed the case and withdrew the petitions, with the notation that the case was "Closing Not According to Plan."

On the basis of these facts, the plaintiffs made the following allegations: The ninety-six hour hold was

unlawfully issued. The neglect and abuse petitions were filed without probable cause and in the face of overwhelming evidence of the absence of abuse and neglect. The defendants' refusal to withdraw the petitions and their insistence that Stephen Shay undergo in-home supervision and counseling was contrary to the evidence in the record and the advice of the department staff. The defendants' conclusion that neglect and abuse of the Shay children had been confirmed was without foundation, unreasonable, arbitrary, wilful, wanton, reckless and malicious and "designed to vindicate and legiti[mize] their handling of the Shay case which was, from the outset, unlawful, uncaring, and unnecessary." The defendants failed to adhere to and violated department policies and regulations. The defendants discriminated against Stephen based on his record as a caring and responsible parent as evidenced by the emergency room records for Maggie Shay and Amelia Shay. The defendants' actions and treatment were in excess of their statutory authority as department officials.[18]

### III

We first consider the relationship between the common-law doctrine of sovereign immunity, which the defendants raise as a shield from the claims against them in their official capacities, and the statutory immunity provided by § 4-165, which they raise as a shield from the claims against them in their individual capacities. Our precedents establish that, where a state official is sued in both her official and individual capacities, if sovereign immunity does not apply to the claim against her in her official capacity, the statutory immunity may then apply to the claim against her in her individual capacity. Thus, before determining whether and to what

---

[18] The plaintiffs also alleged that the filing of the neglect and abuse petitions by Graham-Leichner constituted the unauthorized practice of law. We have since rejected such a proposition; see *In re Darlene C.*, 247 Conn. 1, 14, 717 A.2d 1242 (1998); and the plaintiffs do not rely on it in the present case.

extent the defendants are shielded by the statutory immunity provided by § 4-165, it is appropriate to determine whether the claims against them are barred by the common-law doctrine of sovereign immunity.

We first considered this relationship in *Spring* v. *Constantino*, 168 Conn. 563, 362 A.2d 871 (1975). In the course of determining "whether an attorney occupying the position of public defender and assigned to represent an indigent defendant enjoys immunity from liability for professional malpractice"; id., 564; we surveyed the provisions contained in chapter 53 of the General Statutes; General Statutes §§ 4-141 through 4-165b; entitled "Claims Against the State." *Spring* v. *Constantino*, supra, 569–71. We concluded that "[t]he manifest legislative intent expressed by chapter 53 is that an employee is immune *where and because the state may be sued*, and that the state may be sued in instances where a private person would be liable. See [General Statutes] § 4-160 (a)."[19] (Emphasis added.) *Spring* v. *Constantino*, supra, 571. We subsequently have reiterated that conclusion. "General Statutes § 4-165 was intended to grant state employees immunity where and because the state may be sued . . . . *Spring* v. *Constantino*, supra, 571." (Internal quotation marks omitted.) *McKinley* v. *Musshorn*, 185 Conn. 616, 621, 441 A.2d 600 (1981). "[Section 4-165] is part of chapter 53 which covers claims against the state. The manifest legislative intent expressed by chapter 53 is that an employee is immune where and because the state may be sued, and that the state may be sued in instances where a private person would be liable." (Internal quotation marks omitted.) *Sansone* v. *Bechtel*, 180 Conn. 96, 100, 429 A.2d 820 (1980). "The manifest legislative intent expressed by

[19] General Statutes § 4-160 (a) provides: "When the Claims Commissioner deems it just and equitable, he may authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable."

chapter 53 [of which § 4-165 is a part] is that an employee is immune where and because the state may be sued, and that the state may be sued in instances where a private person would be liable. See [General Statutes] § 4-160 (a)." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal,* 238 Conn. 146, 151, 680 A.2d 1231 (1996).

## IV

We first turn, therefore, to the question of whether the claims against the defendants in their official capacities are barred by sovereign immunity. That is because the statutory immunity provided by § 4-165 applies where sovereign immunity does not apply. In order to reach that question in the procedural posture of this appeal, however, we must first determine whether the trial court's denial of the defendants' motion to dismiss the claims against them in their official capacities was a final judgment for purposes of appeal. That is so because, unless that denial was a final judgment, this court would lack subject matter jurisdiction to consider that question. We agree with the defendants that the denial of a motion to dismiss based on a colorable claim of sovereign immunity is a final judgment for purposes of appeal.

## A

The general rule is that the denial of a motion to dismiss is an interlocutory ruling and, therefore, is not a final judgment for purposes of appeal. *Sasso* v. *Aleshin,* 197 Conn. 87, 90, 495 A.2d 1066 (1985); see also *State* v. *Coleman,* 202 Conn. 86, 92, 519 A.2d 1201 (1987) (motion based on General Statutes § 54-193 (b), statute of limitations for felony). We have recognized, however, that otherwise interlocutory orders may constitute appealable final judgments in two circumstances: "(1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action

so concludes the rights of the parties that further proceedings cannot affect them." *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). The defendants contend that the denial of a motion to dismiss based on the grounds of sovereign immunity comes within the second prong of *Curcio*, because sovereign immunity is an immunity, not simply from liability, but from suit as well. We agree.

The second prong of the *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish "that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [party] irreparably harmed unless they may immediately appeal." *Ruggiero* v. *Fuessenich*, 237 Conn. 339, 347, 676 A.2d 1367 (1996). The nature of sovereign immunity is such a right. It protects the state, not only from ultimate liability for alleged wrongs, but also from being required to litigate whether it is so liable. Therefore, unless the state is permitted to appeal a trial court's denial of its motion to dismiss, filed on the basis of a colorable claim of sovereign immunity, the state's right not to be required to litigate the claim filed against it would be irretrievably lost.

We have in the past phrased the underlying rationale of the doctrine of sovereign immunity in theoretical terms. For example, in *Horton* v. *Meskill*, 172 Conn. 615, 623–24, 376 A.2d 359 (1977), we noted, "as Mr. Justice Holmes wrote: 'A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.' *Kawananakoa* v. *Polyblank*, 205 U.S. 349, 353, 27 S. Ct. 526, 51 L. Ed. 834 [1907] . . . ." (Citation omitted.) The modern rationale for the doctrine, however, rests on the more practical ground " 'that the subjection of the state and federal

governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property.' J. Block, 'Suits Against Government Officers and the Sovereign Immunity Doctrine,' 59 Harv. L. Rev. 1060, 1061 (1946)." *Pamela B.* v. *Ment*, 244 Conn. 296, 328, 709 A.2d 1089 (1998). This rationale suggests that the doctrine protects the state from unconsented to litigation, as well as unconsented to liability.

Although we have never explicitly delineated this particular aspect of the doctrine in final judgment terms, our sovereign immunity cases implicitly have recognized that the doctrine protects against suit as well as liability—in effect, against having to litigate at all. In *Bergner* v. *State*, 144 Conn. 282, 286, 130 A.2d 293 (1957), we recognized the distinction between immunity from suit and from liability, and held that a statutory waiver of sovereign immunity constituted a waiver of suit and provided "a remedy to enforce such liability as the general law recognizes." See also *Babes* v. *Bennett*, 247 Conn. 256, 271, 721 A.2d 511 (1998) (where state sued pursuant to statutory waiver of sovereign immunity in action for negligence of state employee operating state owned vehicle, state not immune from reallocation of damages pursuant to General Statutes § 52-572h [g]); *Struckman* v. *Burns*, 205 Conn. 542, 559, 534 A.2d 888 (1987) (statutory waiver of sovereign immunity from suit was not waiver of immunity from prejudgment interest); *State* v. *Chapman*, 176 Conn. 362, 366, 407 A.2d 987 (1978) (statutory waiver of sovereign immunity from suit was not waiver of immunity from costs). These cases demonstrate that the state's waiver of its immunity from liability only arises after a prior determination that it has waived its immunity from suit, and that a waiver of immunity from

suit does not necessarily imply a waiver of immunity from all aspects of liability.

Thus, as the defendants suggest, the state's sovereign immunity right not to be required to litigate at all, as opposed to its right not to be ultimately subjected to liability, is analogous to that facet of the criminal defendant's constitutional double jeopardy right not to be tried twice for the same offense. Because that constitutional right includes the right not even to be tried for the same offense, the denial of a motion to dismiss criminal charges, filed on the basis of a colorable claim of double jeopardy, is an immediately appealable final judgment under the second prong of *Curcio*. See *State* v. *Van Sant*, 198 Conn. 369, 374 n.5, 503 A.2d 557 (1986). Similarly, therefore, in a civil case the denial of a motion to dismiss, filed on the basis of a colorable claim of sovereign immunity, must be regarded under *Curcio* as an immediately appealable final judgment.

We recognize, however, that in *State* v. *Malkowski*, 189 Conn. 101, 105–106, 454 A.2d 275 (1983), we held that the denial of the state's plea in abatement, filed on the ground of sovereign immunity, was not a final judgment for purposes of appeal. That case, in which we stated that "[n]othing in the circumstances of this case warrants departure from the final judgment rule"; id., 105; was decided before our refinement of our final judgment jurisprudence in *Curcio*, and without full appreciation of the analogy between sovereign immunity as a defense to a civil claim, and double jeopardy as a defense to a criminal complaint. We are persuaded that our refined final judgment jurisprudence and that analogy require the conclusion that the denial of a motion to dismiss based on sovereign immunity is an appealable final judgment. We therefore overrule *State* v. *Malkowski*, supra, 101.

B

There is no dispute that the defendants' claim of sovereign immunity is colorable. We turn, therefore, to the merits of the defendants' claim that the trial court improperly denied their motion to dismiss the plaintiffs' claims against them in their official capacities. The defendants argue that the facts of the case do not bring it within any recognized exception to the sovereign immunity doctrine. We disagree. We conclude that the facts of this case bring it within the exception to sovereign immunity for conduct by state actors that is in excess of their statutory authority.

"We have . . . recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state. *Sentner* v. *Board of Trustees*, 184 Conn. 339, 342, 439 A.2d 1033 (1981). In its pristine form the doctrine of sovereign immunity would exempt the state from suit entirely, because the sovereign could not be sued in its own courts and there can be no legal right as against the authority that makes the law on which the right depends. *Kawananakoa* v. *Polyblank*, [supra, 205 U.S. 353]; *Bergner* v. *State*, [supra, 144 Conn. 284–85]. This absolute bar of actions against the state has been greatly modified both by statutes effectively consenting to suit in some instances as well as by judicial decisions in others. *Doe* v. *Heintz*, 204 Conn. 17, 31, 526 A.2d 1318 (1987); see also 57 Am. Jur. 2d, Municipal, County, School and State Tort Liability § 61 et seq. (1988).

"It does not necessarily follow, however, that every action in which state officials or members of state agencies are named defendants and designated by official titles should be treated as an action against the state such as to clothe the defendants with immunity from suit. *Simmons* v. *Parizek*, 158 Conn. 304, 307, 259 A.2d

642 (1969). Sovereign immunity does not bar suits against state officials acting in excess of their statutory authority or pursuant to an unconstitutional statute. *Horton* v. *Meskill*, [supra, 172 Conn. 624].

"In those cases in which it is alleged that the defendant officer is proceeding . . . in excess of his statutory authority, the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine. . . . Id., quoting J. Block, [supra, 59 Harv. L. Rev. 1080–81]. In such instances, the need to protect the government simply does not arise and the government cannot justifiably claim interference with its functions . . . . *Horton* v. *Meskill*, supra, 172 Conn. 624. Where [however] no substantial claim is made that the defendant officer is acting pursuant to an unconstitutional enactment or in excess of his statutory authority, the purpose of the sovereign immunity doctrine requires dismissal of the suit for want of jurisdiction. Id." (Internal quotation marks omitted.) *Antinerella* v. *Rioux*, supra, 229 Conn. 487–88.

*Antinerella* v. *Rioux*, supra, 229 Conn. 489, was the first case in which we were called upon actually to apply the doctrine that sovereign immunity "does not apply to suits against state officials acting in excess of their statutory authority . . . ." In that case, we concluded that allegations that the defendant, the high sheriff of Hartford county, had discharged the plaintiff, a deputy sheriff, "in order to take his business and personally benefit under the statutorily forbidden and illegal fee splitting arrangements he had made with several appointed deputy sheriffs," were sufficient to constitute an action in excess of the defendant's statutory authority to discharge the plaintiff under the at-will employee doctrine. Id., 491. Important to that conclusion, moreover, was the notion that the defendant's alleged conduct contravened the "clear public policy that a high

sheriff may not engage in fee splitting," as reflected in General Statutes §§ 6-36[20] and 6-46.[21] Id., 493.

We have never defined the precise contours of the "in excess of statutory authority" doctrine; id., 489; which removes the shield of sovereign immunity from state officials sued in their official capacities. Thus, we have never decided just how far outside that statutory authority the official must act in order for the doctrine to apply. The defendants suggested at oral argument before this court that it should be viewed similarly to the doctrine of judicial immunity, which has been held not to apply only where the *judicial conduct is so far outside the normal scope of judicial functions that the judge was in effect not acting as a judge.* See, e.g., *Stump* v. *Sparkman*, 435 U.S. 349, 364, 98 S. Ct. 1099, 55 L. Ed. 2d 331, reh. denied, 436 U.S. 951, 98 S. Ct. 2862, 56 L. Ed. 2d 795 (1978) (even though judge improperly granted petition to sterilize young girl, without a hearing, judicial immunity held to apply because state law vested in him power to act upon such petition). Thus, the defendants argue that, in order for them to have acted in excess of their statutory authority, their conduct must be shown to have been so far outside their

[20] General Statutes § 6-36 provides: "If any sheriff (1) knowingly demands or receives illegal fees for serving process, (2) illegally detains any money collected by him or (3) refuses to satisfy any execution issued against him, the General Assembly shall remove him from office. The terms 'knowingly demands' and 'receives', as used in this section, include billing for and the receipt of fees for work by a sheriff who did not actually perform the work for which billing is made or for which payment has been received."

[21] General Statutes § 6-46 provides: "Sheriff may recover on bond of deputy. Not to demand fee from deputy. If any sheriff is sued on account of the default of his deputy, he may recover on the bond of such deputy fifteen dollars in addition to the amount recovered from him or which he has been compelled to pay on account of such default. If any sheriff demands or receives any compensation from any deputy, he shall, by the superior court in the county for which he is sheriff, on the information of the state's attorney, be removed from office and adjudged forever disqualified to hold the office of sheriff."

normal duties that they in effect had acted in the "clear absence of all jurisdiction." Otherwise, the defendants contend, the exception to sovereign immunity would threaten to swallow the rule, because "then sovereign immunity could be circumvented in every circumstance in which a state employee is alleged to have committed a wrongful act." The plaintiffs offer no standard by which to gauge the doctrine, but agreed at oral argument that it would require something more than simply engaging in an improper act during the course of employment.

We reject the defendants' position. First, it is inconsistent with our application of the doctrine in *Antinerella*. In that case, the defendant, although alleged to be acting illegally in contravention of a clearly articulated public policy, and with improper motives, cannot be said to have been acting so far outside the normal duties of a high sheriff that he was in effect not acting as a sheriff. *Antinerella* v. *Rioux*, supra, 229 Conn. 491–92. He did, after all, have the statutory power to terminate the plaintiff's employment without cause. Id., 491. Second, the available case law from other jurisdictions does not support the defendants' limited view of the doctrine. Indeed, those authorities suggest that all it takes to trigger the doctrine is to establish, by a process of statutory interpretation, that the defendants' conduct was unauthorized.[22]

---

[22] See, e.g., *Chilivis* v. *National Distributing Co.*, 239 Ga. 651, 654–55, 238 S.E.2d 431 (1977) (sovereign immunity did not shield state revenue commissioner acting without statutory authority to settle private contract dispute); *Senn Park Nursing Center* v. *Miller*, 104 Ill. 2d 169, 188, 470 N.E.2d 1029 (1984) (sovereign immunity not shield where director of public aid changed Medicaid reimbursement procedure without complying with statutory prerequisites); *Fortin* v. *Morton*, 101 N.H. 477, 479, 147 A.2d 644 (1958) (sovereign immunity shielded commissioner of public works and highways where restricting access to highway was within statutory authority); *Lewis* v. *White*, 287 N.C. 625, 632–44, 216 S.E.2d 134 (1975) (sovereign immunity *was* bar: [1] to claim that museum building commission exceeded statutory authority by conducting meetings in secrecy, where nothing in statutes supported contention that all action was void if meeting was not open to

We do not agree, however, with the suggestion inherent in those authorities, precisely for the reason given by the defendants, namely, that the doctrine of sovereign immunity would be too easily overcome. It would mean, for example, that any tort committed by a state official would not be subject to sovereign immunity, because it could hardly be contended that any such official was statutorily authorized to commit a tort.

Although we cannot, at least in this case and at this stage of our jurisprudence, define with any degree of specificity where the line is, we think it is somewhere between those two poles, namely, at one pole, the standard for abrogation of judicial immunity, and at the other pole, that a process of statutory interpretation yields a conclusion that the state officials acted beyond their authority. We also conclude that the facts of this case bring it sufficiently outside the normal scope of the defendants' statutory authority to invoke the doctrine. In this case, there are undisputed allegations and

---

public; [2] to claim that commission exceeded authority by not consulting building authority, where statutory powers of building authority did not extend to construction of museum; [3] to claim that commission exceeded authority by not obtaining current governor's approval for site, where nothing in statutes required commission to obtain approval from each succeeding governor; [4] to claim that commission exceeded authority by selecting museum site not within certain boundaries, where statutes gave commission discretion to select site; sovereign immunity *was not* bar: [1] to claim that commission exceeded authority by not complying with statutory budget requirements, where statutes supported contention that commission was to adhere strictly to budget requirements; [2] to claim that commission exceeded authority by not complying with various allocation statutes, where proposed site required allocation to commission by department of administration; [3] to claim that commission exceeded authority by planning for construction of cultural center, where statute conferred authority only to build museum); *Dacus* v. *Johnston*, 180 S.C. 329, 340, 185 S.E. 491 (1936) (sovereign immunity not bar to suit where governor exceeded statutory authority by attempting to suspend highway commissioner without hearing); *Cobb* v. *Harrington*, 144 Tex. 360, 365–66, 190 S.W.2d 709 (1945) (sovereign immunity not bar to suit where state comptroller and deputy were "not lawfully authorized" to impose tax on plaintiffs' business).

facts that are sufficiently analogous to the allegations in *Antinerella* to constitute actions in excess of the defendants' statutory authority.

In this respect, the critical factual allegations in the plaintiffs' complaint are that: (1) the neglect and abuse petitions were filed without probable cause[23] and in the face of overwhelming evidence of the absence of abuse and neglect; (2) the defendants' refusal to withdraw the petitions and their insistence that Stephen Shay undergo in-home supervision and counseling were contrary to the evidence in the record and the advice of department staff; and (3) the defendants' conclusion that neglect and abuse of the Shay children had been confirmed was without foundation, unreasonable, arbitrary, wilful, wanton, reckless and malicious, and *"designed to vindicate and legiti[mize] their handling of the Shay case which was, from the outset, unlawful, uncaring, and unnecessary."* (Emphasis added.) These allegations, including the last allegation in particular, read broadly in the plaintiffs' favor, as they must be; *Bohan* v. *Last*, 236 Conn. 670, 674, 674 A.2d 839 (1996); charge the defendants with improper and self-serving motives in filing the neglect and abuse petitions, in pursuing them for as long as they did, and in pursuing the in-home supervision of the family for as long as they did. The improper and self-serving motives that could be proven under these factual allegations were

---

[23] We note that, although in the context of a criminal case, whether probable cause exists for official action presents a question of law; see, e.g., *State* v. *Bergin*, 214 Conn. 657, 661–62, 574 A.2d 164 (1990) (trial court's probable cause determination reviewable as question of law); in the context of an action under 42 U.S.C. § 1983, which is the basis for at least one of the plaintiffs' claims in the present case, the existence of probable cause presents a factual question for the jury. See, e.g., *Ham* v. *Greene*, 248 Conn. 508, 521–26, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999); see also *DeLaurentis* v. *New Haven*, 220 Conn. 225, 252–53, 597 A.2d 807 (1991) (in vexatious litigation action, "when the facts themselves are disputed, the court may submit the issue of probable cause in the first instance to a jury as a mixed question of fact and law").

that, by the time that the petitions were filed and by the time that the in-home supervision was ordered to continue, the defendants knew that these actions were legally and factually unjustified; that the defendants filed the petitions knowing that they were unwarranted; and that they nonetheless pursued the petitions and the in-home supervision of the family, not for the statutory purpose of protecting any of the Shay children, but in order to justify those prior unjustified actions. In *Antinerella* v. *Rioux*, supra, 229 Conn. 497, we stated that when "the state employee acts solely to further his or her own illegal scheme and not to carry out government policy, there is no reason to provide immunity from suit." Similarly, if the defendants here acted solely in order to justify their own prior unjustified conduct, and not to carry out the government policy with which they were entrusted, there would be no reason to provide immunity from suit.

We emphasize, of course, that these are simply allegations, which are subject to proof at trial. We also note, however, that these are allegations regarding the defendants' states of mind and motives, facts that we have stated are not ordinarily subject to determination on the basis of documentary proof alone. See *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 111, 639 A.2d 507 (1994) ("[s]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions" [internal quotation marks omitted]), quoting *Batick* v. *Seymour*, 186 Conn. 632, 646–47, 443 A.2d 471 (1982); *Connell* v. *Colwell*, 214 Conn. 242, 251, 571 A.2d 116 (1990) (same).

We agree with the defendants, however, that in order to overcome sovereign immunity, the plaintiffs must do more than allege that the defendants' conduct was in excess of their statutory authority; they also must allege or otherwise establish facts that reasonably support

those allegations. The plaintiffs' allegations are reasonably supportable by the following facts in the record.[24]

The neglect and abuse petitions were filed on February 16, 1996. Prior to that filing, Tavernier had altered his initial opinion regarding the cause of Charlotte Shay's fracture, namely, that it was *inconsistent* with Kyle Shay's statement of how it had occurred, by stating that it was *possibly inconsistent* with that statement. He had confirmed this in writing by stating that he was not an orthopedic specialist, that "the injuries may possibly have occurred in the manner stated by the parents," and that Charlotte should not be taken from her parents. Tavernier also had objected to the ninety-six hour hold, and had expressed concern about removing Charlotte from her mother's care. In addition, Gundy had opined directly to the department that it was possible for a child of Charlotte's age to have sustained such a fracture in that manner, and that this opinion was consistent with the study conducted at Yale. Gundy also had recommended against removal of Charlotte. Furthermore, Hack, Charlotte's regular pediatrician, had stated that the fracture and Kyle's statements were consistent with each other, and Brown, the orthopedic surgeon who had treated the fracture, stated that the fracture was not a spiral fracture, but was a minimally displaced transverse fracture, and that he was not convinced that there had been neglect or abuse with respect to Charlotte.

Moreover, prior to the filing of the petitions, the department knew that the police had investigated the

[24] In this connection, we note that certain parts of the documentary record may be read as inconsistent with or explanatory of these facts, in the defendants' favor. To the extent, however, that facts exist in favor of the plaintiffs' claim, those facts must be taken in that light for purposes of the defendants' motion to dismiss. *Thomas* v. *West Haven*, 249 Conn. 385, 392, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000); *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 548, 447 A.2d 406 (1982).

matter and had concluded that there was no evidence of abuse. In addition, both Hack and D'Isidori, the pediatricians who regularly had been treating all of the children and who had recommended all of the various trips to the emergency room, including the present one, emphatically had indicated their opinions that there had never been any indication of neglect or abuse, and that, if anything, the Shays were overprotective parents. Furthermore, the parents had given fuller accounts of the prior emergency room admissions, and the paternal grandmother had confirmed the account of the lawn mower incident. Also, the department had information from Kelsey Shay's day care that Kyle Shay had dropped her off and picked her up daily, and that there were no concerns regarding abuse or neglect.

Nonetheless, on the day before the filing of the petitions, Lupke informed Kyle Shay that she was incapable of caring for her four children, that two of them should be in foster care, and that the department intended to go forward with the ninety-six hour hold. In addition, on the same day the department intake form described the children as victims of severe neglect who should be removed from the home unless in-home services were provided. That afternoon, however, the department received the written statements from the four physicians, a common theme of which was that none of the children was a victim of neglect or abuse, and that they should not be removed from the home.

Furthermore, on the day that the neglect and abuse petitions were filed, Murphy admitted to the Shays that the case was "a major screw up," that Tavernier had "goofed," and that "a big mistake had been made here." These petitions alleged that Charlotte Shay had been abused, based upon the suspicions reported by the attending physician that the fracture was inconsistent with the history given by Kyle Shay. The petitions also alleged that the other three children were victims of

neglect or abuse based on their prior emergency room visits "due to accidents because of poor supervision." They did not, however, indicate Tavernier's subsequent modification of his original opinion, Brown's opinion as the treating orthopedic surgeon that the history of Charlotte's fracture was not necessarily inconsistent with that history, or Hack's opinion that the two were in fact consistent. Nor did the petitions give any support for their allegations of "poor supervision," other than the instant occasion and the prior emergency room visits, or state the uniform opinion of all of the physicians involved that there was no concern of abuse or neglect with respect to any of the children.

After the filing of the petitions and the institution of the in-home supervision program on February 16, 1996, the following facts also support the plaintiffs' allegations of improper motives on the part of the defendants in maintaining the petitions and that program. On February 20, 1996, Murphy described the department's "confirmation of the neglect report, based on statements by the involved collaterals and interviews with family members." This description may be viewed as an overstatement, at best, and as simply inconsistent with the body of evidence available as of that date, at worst. The February 23, 1996 case disposition summary of the department repeated this description, characterized the "[o]verall risk" to the children as "high," referred to "the reported and substantiated concerns over a lack of appropriate supervision of the children in the home," and to the "neglect confirmation." This description and reference may be viewed in the same manner.

Nonetheless, on February 29, 1996, Shardan told the department that there had been no abuse in the home, and on March 6, 1996, Coullet informed the department that there was no need to continue with the family, whom he regarded as overprotective, and that the

department was traumatizing the family. Furthermore, the March 6 visit to the home by Alvarez, the department social worker, disclosed a healthy and safe environment. It also disclosed further detailed accounts of all of the prior emergency room visits, the gist of which were that they were all in response to household accidents and that none of them involved actual serious injury to any child. That home visit also disclosed to the department that Kyle Shay was an at-home full-time mother, who had additional help with her children on Saturdays.

At the March 14, 1996 meeting at the department, Coullet gave his opinion that the children were safe and that he saw no reason to continue with in-home supervision. Nonetheless, the department decided to continue with the petitions until further evaluation was done, and until the court decided whether the department had any valid reason to be involved. Coullet's subsequent termination summary described the reasons for the prior emergency room visits as "arguably well within the spectrum of 'normal' childhood occurrences," and confirmed that Kyle Shay's account of how she fell with Charlotte Shay in her arms "could certainly" have occurred in that manner. He concluded that, "[d]espite the presence of red flags occasioned by the broken femur and subsequent inspection of the hospital records, no evidence of pathology was found within this family and it appears that they are not neglectful of their children."

Nonetheless, on March 15, 1996, the department decided to keep the neglect and abuse petitions on file, to ask for a continuance on the scheduled court date, and to defer for an additional month thereafter the decision on whether to withdraw the petitions. The department family treatment plan, prepared on March 22, 1996, although noting the absence of neglect or abuse concerns on the part of the children's pediatri-

cians and Coullet, also referred to "[p]ossible lack of supervision of the children resulting in frequent visits to the emergency room." It did not, however, refer to the repeated, and by now partially confirmed, contrary explanations for those visits, nor to Coullet's opinion that those incidents were arguably within the normal spectrum of ordinary childhood accidents. Moreover, the treatment plan contemplated three more months of oversight and supervision by the department.

When the neglect and abuse petitions came before the court on March 27, 1996, and the Shays moved for their dismissal, the defendants opposed the dismissal and filed the social study. This study reported the finding of Coullet, who had been in the home for several weeks, that there was no pathology in the family and his statement that the parents were not neglectful of their children, and it also reported the statements of both Tavernier and the children's pediatricians that they had no concerns of abuse or neglect. The social study noted the family strengths: the closeness and love between parents and children; the fact that Kyle Shay was a homemaker who spent all of her time caring for her children; and the presence of family support from parents and siblings. It defined the family "weakness" as the fact that the same stay-at-home caretaker "may become stressed and overwhelmed. Parenting four toddlers can be a stressful and demanding responsibility." Nonetheless, despite these statements, and this rather remarkable[25] definition of a family "weakness," the social study recommended an additional six months of protective supervision. Five days later, however, on

---

[25] Or unremarkable, as the case may be. It strikes us that it is hardly remarkable that caring for four toddlers may be stressful and demanding, and even overwhelming at times. That is hardly a basis, however, for an inference of abuse or neglect. It also strikes us, however, as remarkable to characterize that probability as a "weakness" of a family with four very young children.

April 2, 1996, the department decided to close the case, and on April 11, 1996, the petitions were withdrawn.

The totality of these facts, if proven, would permit a fact finder to infer that the defendants filed the neglect and abuse petitions knowing that they were unjustified, and continued them with that knowledge, that they continued the in-home supervision of the Shay family beyond the time that they knew was justified, and that they did so, not for the statutory purpose of protection of the children, but to justify their prior unjustified actions. These inferences would be sufficient to establish that the defendants' conduct was sufficiently egregious as to constitute conduct that was in excess of their statutory authority.

We acknowledge that, as the defendants suggest, their task in protecting children from abuse and neglect is a very sensitive and difficult one, and that they must not be unduly hampered in carrying out that task. We recognize that it is not for the courts to apply acute hindsight in such a way that will chill their legitimate efforts in that regard. Nonetheless, in this case we are constrained to conclude that the factually supported allegations are serious enough to warrant the conclusion that the defendants are not shielded by the doctrine of sovereign immunity.

V

Having concluded that the plaintiffs' claims against the defendants in their official capacities were not barred by sovereign immunity, we turn to the question, raised by the plaintiffs' appeal, of whether their claims against the defendants in their individual capacities were barred by the statutory immunity provided by § 4-165. The plaintiffs claim that the trial court improperly concluded that they had failed to establish that the defendants' conduct was "wanton, reckless or malicious," so as to fall within the exception to the statutory

immunity for such conduct. We agree. We conclude that the facts produced in the trial court were sufficient to fall within the exception to the statutory immunity for conduct that is "wanton, reckless or malicious . . . ." General Statutes § 4-165.

General Statutes § 4-165 provides in pertinent part: "No state officer or employee shall be personally liable for damage or injury, *not wanton, reckless or malicious*, caused in the discharge of his duties or within the scope of his employment. . . ." (Emphasis added.) All of the parties agree that, but for the exception in the statute for wanton, reckless or malicious conduct, the defendants would be statutorily immune for their conduct in this case. The question, therefore, is whether their conduct comes within that exception.

We have never definitively determined the meaning of "wanton, reckless or malicious" as used in § 4-165. In the common-law context, however, we have stated: "In order to establish that the defendants' conduct was wanton, reckless, wilful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of a state of consciousness with reference to the consequences of one's acts . . . . [Such conduct] is more than negligence, more than gross negligence. . . . [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. . . . [*Dubay* v. *Irish*, 207 Conn. 518, 532–33, 542 A.2d 711 (1988)]." (Internal quotation marks omitted.) *Elliott* v. *Waterbury*, 245 Conn. 385, 415, 715 A.2d 27 (1998). We see

no reason to give a different meaning to that phrase as used in § 4-165.

The same facts and allegations that led us to conclude that the defendants' conduct was in excess of their statutory authority, lead us to conclude that the defendants could be found to have acted wantonly, recklessly or maliciously. As stated in part IV B of this opinion, the allegations and supporting facts adduced in the trial court were sufficient to establish that the defendants had acted with improper and self-serving motives in filing the neglect and abuse petitions, in pursuing the plaintiffs for as long as they were pursued, and in pursuing the in-home supervision of the family for as long as it was pursued. The motives that could be proven under the allegations, which are supportable by the facts adduced, were that by the time the petitions were filed and by the time that the in-home supervision was ordered to continue, the defendants knew that these actions were legally and factually unjustified; that the defendants filed the petitions knowing that they were unwarranted; and that they nonetheless pursued the petitions and the in-home supervision of the family, not for the statutory purpose of protecting any of the Shay children, but in order to justify those prior unjustified actions.

These allegations and supporting facts may fairly be characterized as showing a state of consciousness regarding the consequences of the defendants' conduct that was more than negligence or gross negligence. Their conduct, if proven, could be found to indicate a reckless disregard of the plaintiffs' rights to family privacy and integrity free of unwarranted interference by the state. It falls within the standard of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger of unduly traumatizing the plaintiffs' family was apparent.

On the plaintiffs' appeal, the judgment is reversed and the case is remanded to the trial court for further proceedings according to law; on the defendants' cross appeal, the judgment is affirmed.

In this opinion the other justices concurred.