## BARRY HULTMAN ET AL. *v.* RICHARD BLUMENTHAL
### (AC 21369)

Foti, Schaller and Dupont, Js.

Argued September 24, 2001—officially released January 15, 2002

*Norman A. Pattis*, with whom, on the brief, was *Dawne Westbrook*, for the appellant (plaintiffs).

*Mark F. Kohler*, assistant attorney general, for the appellant (defendant).

*Opinion*

DUPONT, J. The plaintiffs, Barry Hultman and his mother, Dorothy Hultman, appeal from the judgment rendered in favor of the defendant, Richard Blumenthal,[1] after the trial court granted the defendant's motion to dismiss the plaintiffs' cause of action for emotional distress arising from the defendant's allegedly defamatory statements about the plaintiffs. The plaintiffs claim that the court improperly granted the motion, which was based on the lack of subject matter jurisdiction. The issue raised in the motion was whether the doctrine of sovereign immunity[2] or the statutory immunity provided by General Statutes § 4-165[3] is a jurisdictional bar to the maintenance of the plaintiffs' action. We conclude, as did the trial court, that the doctrine of sovereign immunity does apply and thereby deprives the court of subject matter jurisdiction.[4]

The plaintiffs' complaint is in four counts. The first and second counts allege that the defendant's publication of a news release on the state of Connecticut attorney general's Internet web site every day during the calendar year 1999 was defamatory as to the plaintiffs. The third and fourth counts allege that the defendant's statement to a Hartford Courant newspaper reporter

---

[1] The defendant, Richard Blumenthal, was the attorney general for the state of Connecticut at the time the events underlying this appeal occurred and at the time this decision was released.

[2] The doctrine of sovereign immunity implicates subject matter jurisdiction and is a basis for the granting of a motion to dismiss. *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, 239 Conn. 93, 99, 680 A.2d 1321 (1996).

[3] General Statutes § 4-165 provides in relevant part: "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. . . . ."

[4] The trial court did not reach the question of whether the statutory immunity of General Statutes § 4-165 applied, but stated in dicta that the defendant's statements would not establish "wanton, reckless, or malicious" conduct.

on or about December 15, 1998, was defamatory as to the plaintiffs.

Blumenthal is not described in the complaint as the attorney general of the state of Connecticut, but the defendant's brief describes the defendant as the attorney general. The statements attributed to him are alleged to have been published on the attorney general's web site, and the summons describes him as the attorney general.[5]

The determination of whether subject matter jurisdiction exists is a question of law and, thus, our review is plenary. *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410, 722 A.2d 271 (1999); *SLI International Corp.* v. *Crystal*, 236 Conn. 156, 163–64, 671 A.2d 813 (1996). If the motion is accompanied by supporting affidavits containing facts, as is the case here, we review the case by looking at the content of the affidavits, as well as the complaint, to determine the jurisdictional issue, and we need not conclusively presume the validity of the allegations of the complaint. *Shay* v. *Rossi*, 253 Conn. 134, 140, 749 A.2d 1147 (2000); *Barde* v. *Board of Trustees*, 207 Conn. 59, 62, 539 A.2d 1000 (1988); see also Practice Book § 10-31.[6]

The judgment of dismissal in this case was based on the inferences to be drawn from the plaintiffs' complaint, the additional evidence submitted by the defendant in this action, and the facts found in an

---

[5] Even if the plaintiffs' complaint was intended as one seeking relief from the defendant in his individual capacity, the defendant would not be precluded from invoking the doctrine of sovereign immunity. See *Martin* v. *Brady*, 64 Conn. App. 433, 436–38, 780 A.2d 961, cert. granted on other grounds, 258 Conn. 919, 782 A.2d 1244 (2001).

[6] Practice Book § 10-31 (a) provides in relevant part: "The motion to dismiss shall be used to assert (1) lack of jurisdiction over the subject matter . . . . This motion shall always be filed with a supporting memorandum of law, and where appropriate, with supporting affidavits as to facts not apparent on the record."

administrative appeal entitled *Hultman* v. *Dept. of Social Services*, 47 Conn. Sup. 228, 783 A.2d 1265 (2000). In that case, the plaintiffs appealed to the trial court from an order of the department of social services (department) suspending them from the medicaid program and ordering restitution by the plaintiffs to the department of overpayments received by them. The court dismissed that appeal, and the plaintiffs did not appeal from that dismissal.

The first question to be resolved is whether, on the basis of the legal inferences to be drawn from the complaint, the facts found in *Hultman* v. *Dept. of Social Services*, supra, 47 Conn. Sup. 228, and the other evidence, the defendant is barred from using a defense of sovereign immunity.[7]

The following procedural history and the facts that were before the trial court are relevant to our resolution of the plaintiffs' appeal. From October 1, 1993, through September 30, 1995, Countryside Manor, Inc. (Countryside), was a long-term health care facility in Bristol that furnished goods and services to medicaid recipients. During that period, Dorothy Hultman was president of Countryside, and Barry Hultman was the administrator of Countryside.

The plaintiffs submitted cost reports to the department to allow the department to determine the rate of medicaid reimbursement to Countryside. The plaintiffs signed under oath those cost reports for the years 1994 and 1995. They certified that they had read the reports and that the information contained in the reports was " 'true and correct' " to the best of their knowledge

---

[7] The plaintiffs' brief states that the sole issue is whether the "statements made to the press by the attorney general in relation to a civil case could not as a matter of law reflect malice." That issue does not include the web site statements as alleged in the plaintiffs' complaint and appears to address the issue of the statutory immunity of General Statutes § 4-165 rather than sovereign immunity.

" 'under the penalty of perjury.' " Id., 230. The reports also certified that all of the expenses cited in the reports were incurred to provide patient care at Countryside.

The department had a contract with Ernst & Young to audit the cost reports of long-term care facilities. Together, the department and Ernst & Young audited the cost reports for Countryside. When the audit was completed, Countryside was in bankruptcy, and the plaintiffs no longer were operating Countryside. The Bankruptcy Court had appointed a trustee and receiver-manager as administrator for Countryside. The trustee sent a preliminary draft of the audit report to the plaintiffs outlining the proposed disallowances and a letter offering the plaintiffs an opportunity to explain the proposed disallowances. The audit report states that the plaintiffs never paid, as they swore they had, $10,829 in payroll taxes and $678,509 in employee 401 (k) withholdings. Barry Hultman responded that the audit report was not valid, but did not agree to meet with the department.

On April 4, 1997, the department issued to the plaintiffs a notice of regulatory violations and proposed sanctions. On April 17, 1997, the plaintiffs filed an answer denying each of the allegations in the notice issued by the department. Following a hearing before a hearing officer, the department ordered the plaintiffs to reimburse the department for the overpayments set forth in the notice of violations and suspended them from the medicaid program.

"At the hearings before the hearing officer, the plaintiffs were represented by counsel and had the opportunity to cross-examine the witnesses. The hearing officer made ninety-six specific findings of fact. Included were findings that the plaintiffs failed to maintain time records for Countryside employees, the salaries and wages paid to these employees were not supported by

documentation, and salaries paid to these employees, including Barry W. Hultman, were not related to patient care. Among the costs in the cost reports that were disallowed were the expenses of a trip the plaintiffs made to India, meals bought at Hooters [restaurant], the purchase of guns and ammunition, and the cost of supplies and materials for the plaintiffs' residence constructed at 82 Meadow Ridge in Avon." Id., 232.

In this case, the defendant filed an affidavit from an assistant attorney general in connection with his motion to dismiss and the facts contained in that affidavit were identical to many of the facts found in *Hultman* v. *Dept. of Social Services*, supra, 47 Conn. Sup. 228.

On April 7, 1997, the defendant, through the attorney general's office, issued a news release. The defendant posted the news release on the attorney general's web site. The news release contained the headline, "Blumenthal and Starkowski charge mother and son with allegedly blinking [sic] state of over $1 million in medicaid money in nursing home scheme." Some of the relevant parts of the body of the article were:

"Attorney General Richard Blumenthal and Department of Social Services Deputy Commissioner Michael P. Starkowski today charged a mother and son who operated a Bristol nursing home with cheating the state out of more than $1 million in medicaid reimbursements. They allegedly used the money to help build their state-of-the-art, luxury home in Avon and for other personal expenses.

"Dorothy Hultman and Barry Hultman of Avon are accused of billing the state for approximately $1.15 million in medicaid reimbursements that they allegedly used for personal benefit— including $551,853 in salaries for people who built their home and payments to relatives and others who spent little or no time working at the Countryside Manor nursing home in Bristol.

" 'Our audit showed that the Hultmans pocketed money meant for medical care—looting programs designed to help our most vulnerable citizens,' Blumenthal said. 'Their luxury home in Avon was literally built on the backs of taxpayers and their self-dealing deprived people in real need of aid. This case is one of the most reprehensible and outrageous medicaid frauds we have seen. We want the money back and we want to shut these people out of the medicaid program.' 'This administration will not tolerate fraud or abuse in our programs, whether it be provider fraud, client fraud or fraud by any other participant in our programs,' Starkowski said. 'We cannot afford to have scarce dollars removed from the system by unscrupulous providers.' The state is seeking sanctions against the Hultmans for violations of laws governing reimbursement of medicaid providers."

On or about December 15, 1998, the defendant told a reporter for the Hartford Courant that the plaintiffs were guilty of the most "egregious" and "blatant" abuse of medicaid funds he had ever seen. On January 27, 2000, Barry Hultman was indicted on federal charges in connection with alleged embezzlement against a bankruptcy estate and theft concerning programs receiving federal funds, specifically the medicare and medicaid programs.

On appeal to this court, the plaintiffs argue that the defendant's statements were "wanton, reckless or malicious" under § 4-165.[8] The trouble with the plaintiffs'

---

[8] The plaintiffs also argue that the attorney general, acting as this state's highest lawyer, had a responsibility to adhere to the Rules of Professional Conduct, and that his statements to the press violated the Rules of Professional Conduct concerning trial publicity and statements made outside the courtroom.

This case, however, is not a review of a disciplinary hearing or the defendant's conduct as an attorney. The preamble to the Rules of Professional Conduct provides in relevant part that a "[v]iolation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance

argument is that the trial court did not reach the question of the immunity provided by § 4-165. The court did not reach that question because the immunity provided by § 4-165 does not apply if the doctrine of sovereign immunity does apply. See *Shay* v. *Rossi*, supra, 253 Conn. 164.

The doctrine of sovereign immunity protects state officials and employees from lawsuits resulting from the performance of their duty. The doctrine protects the state against lawsuits as well as protecting against liability, and "in effect, [it protects] against having to litigate at all." Id., 166.

As previously noted, it is unclear from the plaintiffs' complaint alone whether the plaintiffs are suing the defendant in his individual capacity or in his official capacity as the attorney general. The complaint does not describe him as the attorney general. As the court correctly noted, however, the identities of the parties are determined by their description in the summons. See General Statutes § 52-45a;[9] Practice Book § 8-1 (a).[10] The summons describes the defendant as "Attorney General," and the plaintiffs repeatedly refer in their brief to the defendant as "Attorney General Richard Blumenthal." "We have . . . recognized that because

to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. . . ." Rules of Professional Conduct, Scope. Our courts also have held that a violation of the Rules of Professional Conduct is not a basis for an action against an attorney. *Mozzochi* v. *Beck*, 204 Conn. 490, 500–501, 529 A.2d 171 (1987); see *Noble* v. *Marshall*, 23 Conn. App. 227, 230, 579 A.2d 594 (1990).

[9] General Statutes § 52-45a provides in relevant part: "Civil actions shall be commenced by legal process consisting of a writ of summons or attachment, describing the parties, the court to which it is returnable, the return day, the date and place for the filing of an appearance and information required by the Office of the Chief Court Administrator. . . ."

[10] Practice Book § 8-1 (a) provides in relevant part: "Mesne process in civil actions shall be a writ of summons or attachment, describing the parties, the court to which it is returnable and the time and place of appearance, and shall be accompanied by the plaintiff's complaint. . . ."

the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state." *Sentner* v. *Board of Trustees*, 184 Conn. 339, 342, 439 A.2d 1033 (1981).

Our Supreme Court has set forth criteria to determine whether an action is against the state or against a defendant in an individual capacity. The four criteria for an action against the state are: "(1) a state official has been sued; (2) the suit concerns some matter in which that official represents the state; (3) the state is the real party against whom relief is sought; and (4) the judgment, though nominally against the official, will operate to control the activities of the state or subject it to liability." *Spring* v. *Constantino*, 168 Conn. 563, 568, 362 A.2d 871 (1975). The first two criteria are met because the defendant clearly is a state official, and the action involves his actions while representing the state of Connecticut. The third criterion is met because the liability for the damages sought is that of the state. The fourth criterion is met because any judgment against the defendant would operate to control the activities of the state, specifically the role of the attorney general's office in informing the public. We conclude that the defendant is being sued as the attorney general in his official capacity, not personally.

Having concluded that the plaintiffs brought this action against the defendant in his official capacity, we must next determine whether the defendant's actions are protected by the doctrine of sovereign immunity. In other words, we must decide whether his remarks were in excess of his authority as attorney general as established by General Statutes § 3-125.[11] It is difficult

[11] General Statutes § 3-125 provides in relevant part: "The Attorney General shall have general supervision over all legal matters in which the state is an interested party, except those legal matters over which prosecuting officers have direction. He shall appear for the state, the Governor, the Lieutenant Governor, the Secretary, the Treasurer and the Comptroller, and for all

to describe with "any degree of specificity" where the line should be drawn between an excessive use of authority and an appropriate use of authority. *Shay* v. *Rossi*, supra, 253 Conn. 172. The difference, according to *Shay*, is somewhere between two poles. Id. The first pole involves the same standard as is used in the determination of an abrogation of judicial immunity, where a judge must be acting so far outside the normal scope of judicial functions that the judge is no longer acting as a judge. See *Stump* v. *Sparkman*, 435 U.S. 349, 364, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978). The second pole involves a process of statutory interpretation examining whether a state official acted beyond the authority given to the official, that is, beyond the scope of the official's authority. See *Shay* v. *Rossi*, supra, 171–72 n.22.

In *Shay*, the defendants raised the shield of sovereign immunity and the immunity of § 4-165. Our Supreme Court concluded that the facts alleged in that case did bring the state officials' behavior significantly outside the normal scope of their authority. Id., 172. "[I]f the defendants here acted solely in order to justify their own prior unjustified conduct, and not to carry out the government policy with which they were entrusted, there would be no reason to provide immunity from suit." Id., 174. Unlike the defendants in *Shay*, the defendant in this case was not acting to justify prior misconduct. The defendant was informing the public of an investigation duly conducted by his office and was carrying out the government policy of reporting to the public those facts that the attorney general claimed supported the allegations of medicaid fraud.

heads of departments and state boards, commissioners, agents, inspectors, committees, auditors, chemists, directors, harbor masters, and institutions and for the State Librarian in all suits and other civil proceedings, except upon criminal recognizances and bail bonds, in which the state is a party or is interested, or in which the official acts and doings of said officers are called in question . . . ."

General Statutes § 3-125 does not specifically state that the attorney general may give statements to the press and issue press releases. One of the attorney general's implied duties is, however, to inform the public of investigations and to give updates to the public concerning the cases handled by his office. As an elected constitutional official, the attorney general has a duty to inform the public of the matters occurring in his office. See *Foster* v. *Pearcy*, 270 Ind. 533, 536, 387 N.E.2d 446 (1979), cert. denied, 445 U.S. 960, 100 S. Ct. 1646, 64 L. Ed. 2d 235 (1980). As an elected official, his duty to the public may include expressions of his opinion about civil legal matters over which he has general supervision. Government officials who issue statements to the public in the course of their official duties are protected by the doctrine of sovereign immunity and, therefore, are immune from legal actions in connection with those activities. See *Barr* v. *Matteo*, 360 U.S. 564, 575, 79 S. Ct. 1335, 3 L. Ed. 2d 1434 (1959); *Blake* v. *Rupe*, 651 P.2d 1096, 1106 (Wyo. 1982), cert. denied, 459 U.S. 1208, 103 S. Ct. 1199, 75 L. Ed. 2d 442 (1983).

The defendant's actions were conducted in the course of his duties as the attorney general. The press release issued by the defendant clearly states that the charges are "alleged." The defendant's statements directly deal with the charges made by the attorney general's office and fall under the scope of his duty to inform the public.

The attorney general's statements that the case involving the plaintiffs "was one of the most reprehensible and outrageous medicaid frauds we have seen," and that the plaintiffs were engaged in the most "egregious" and "blatant" abuse of medicaid funds he had ever seen were based on his experience as attorney general since 1990. Such statements, in the context of the facts known to him, were presumably based on his ten years of

experience as the chief enforcement officer of cases involving medicaid fraud.

"[I]n order to overcome sovereign immunity, the plaintiffs must do more than allege that the defendants' conduct was in excess of their statutory authority; they also must allege or otherwise establish facts that reasonably support those allegations." *Shay* v. *Rossi*, supra, 253 Conn. 174–75. The plaintiffs in the present case have not sufficiently alleged or established any facts that the defendant's conduct was in excess of his statutory authority.

The plaintiffs argue that the defendant's behavior should be examined under the standard set forth in § 4-165, and maintain that the statements were made in an improper and unjustifiable manner or with improper motive. The standard set forth in § 4-165 does not apply to the current situation because liability under the statute only applies when the defendant has not established a defense of sovereign immunity. Id., 162–64. The doctrine of sovereign immunity does apply to the facts in this case and, therefore, § 4-165 is not applicable.[12]

We conclude that the defendant's motion to dismiss properly was granted because subject matter jurisdiction was lacking.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] Even if General Statutes § 4-165 were applied, the plaintiffs' argument would not prevail. The conduct described as "wanton, reckless or malicious" in § 4-165 has the same meaning as when used in a common-law context. *Shay* v. *Rossi*, supra, 253 Conn. 181–82. "[Such conduct] is more than negligence, more than gross negligence. . . . [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) Id., 181. The defendant's conduct here does not approach such a level.