CHAD PRIGGE ET AL. *v.* KRISTINE RAGAGLIA, COMMISSIONER OF CHILDREN AND FAMILIES, ET AL.
(SC 16787)

Sullivan, C. J., and Borden, Norcott, Palmer and Vertefeuille, Js.

Argued January 10—officially released August 12, 2003

*Eliot D. Prescott,* assistant attorney general, with whom were *Gregory T. D'Auria,* associate attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Susan T. Pearlman* and *John E. Tucker,* assistant attorneys general, for the appellants (defendants).

*Robert T. Rimmer,* for the appellees (plaintiffs).

*Opinion*

BORDEN, J. This appeal presents another chapter in the custody dispute set forth in *In re Joshua S.,* 260 Conn. 182, 796 A.2d 1141 (2002). The dispositive issue in this appeal[1] is whether the trial court properly denied the defendants' motion to dismiss, concluding that sovereign immunity does not bar an action for monetary damages where the plaintiffs have alleged that state officers acted in excess of their statutory authority. The defendants, Kristine Ragaglia, the commissioner of children and families, Kelly McVey, a program supervisor with the department of children and families (department), Gloria Tardif, a social worker with the department, Sherry Rautenberg, a social worker supervisor for the department, and Beverly Bosse, an investigator for the department, all of whom have been sued both in their official and individual capacities, claim that the trial court improperly denied their motion to dismiss on the ground that sovereign immunity barred

---

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

the plaintiffs, Chad Prigge and Sara Prigge, from seeking monetary damages against the defendants in their official capacities. We agree with the defendants, and, accordingly, we reverse the judgment of the trial court.

The plaintiffs brought this action, seeking monetary damages against the defendants both in their official and individual capacities, and also seeking injunctive relief, alleging that the defendants had discriminated against them in certain underlying child custody proceedings. The defendants moved to dismiss the claims against them in their official capacities seeking monetary damages on the ground that the claims were barred by sovereign immunity.[2] The trial court denied the motion to dismiss, concluding that, in light of our decisions in *Shay* v. *Rossi*, 253 Conn. 134, 749 A.2d 1147 (2000), and *Antinerella* v. *Rioux*, 229 Conn. 479, 642 A.2d 699 (1994), sovereign immunity does not bar actions for monetary damages where the plaintiffs have alleged that state officers acted in excess of statutory authority. This appeal followed.

As we must in reviewing a motion to dismiss, we "take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Brookridge District Assn.* v. *Planning & Zoning Commission*, 259 Conn. 607, 611, 793 A.2d 215 (2002). The plaintiffs' claim arises from the defendants' alleged misconduct in handling the temporary and final placement of a child, Joshua S., with a family other than that of the plaintiffs. In their very detailed complaint, the plaintiffs alleged the following facts: Chad Prigge was the husband of Sara Prigge, and they both were mem-

---

[2] The defendants did not seek dismissal of either the plaintiffs' claim for injunctive relief against the defendants in their official capacities, or the plaintiffs' claims against the defendants in their individual capacities. Therefore, those claims are not at issue in this appeal.

bers of the Truth Baptist Church (church). In the summer of 1996, the plaintiffs moved from Minnesota to East Hartford, where Chad Prigge was the assistant pastor at the church. Kelly S. and her husband, Charles S., both members of the church, were the plaintiffs' neighbors and friends. Kelly S. and Charles S. had four children, Jessica M.,[3] Jennifer S., Jonah S. and Joshua S. In July, 1998, Charles S. asked Chad Prigge if the plaintiffs would agree to be named as testamentary guardians of their children. After considering the matter, the plaintiffs agreed and Kelly S. and Charles S. drew their wills accordingly, naming the plaintiffs as testamentary guardians.

The plaintiffs additionally alleged that on June 10, 1999, Kelly S. stabbed Charles S. to death in the bedroom of their home. After also stabbing Jessica M. and pouring gasoline over Jessica M. and herself, and throughout another bedroom, Kelly S. set the house on fire. Jessica M. escaped the fire and ran across the street to the plaintiffs' home, where Chad Prigge called 911. Emergency personnel rescued Joshua S. from the fire, performed cardiopulmonary resuscitation on him and revived him. Jessica M. and Joshua S. were brought to the Connecticut Children's Medical Center (medical center).[4] On June 11, 1999, the department obtained an ex parte order for temporary custody of Joshua S. Joshua S. was transferred to Massachusetts General Hospital, where he remained until June 14, 1999, when he was transferred back to the medical center, where he stayed until he was placed temporarily with a foster family by the defendants.

The plaintiffs alleged that several actions undertaken by the defendants constituted misconduct and that the defendants' decision not to place Joshua S. with the plaintiffs was based on the plaintiffs' religion. Specifically, the plaintiffs alleged that the defendants altered

---

[3] Charles S. was not the biological father of Jessica M.

[4] Neither Jennifer S. nor Jonah S. survived the fire.

and destroyed certain telephone records,[5] intentionally ignored the wills of Charles S. and Kelly S. naming the plaintiffs as testamentary guardians, denied the plaintiffs visitation with Joshua S.,[6] denied them access to a preliminary hearing on the order of temporary custody,[7] failed to conduct a thorough investigation of the plain-

[5] The plaintiffs point to two instances in which the defendants destroyed or altered telephone records. First, on June 16, 1999, Bosse informed Chad Prigge during a telephone conversation that the plaintiffs had been named the testamentary guardians of Joshua S. The plaintiffs alleged that Bosse recorded this telephone call in her log book, but that she later altered the log book entry to reflect that the conversation had taken place on a different date. Second, on June 21, 1999, Chad Prigge spoke to McVey on the telephone and informed her that the plaintiffs intended to pursue custody of Joshua S. McVey took handwritten notes of their conversation. On July 28, 1999, Tardif filed a social study with the court stating that the "[department] learned on 6/22/99 that the [plaintiffs] have changed their minds and stated their intentions to pursue custody of Joshua and not Jessica." The study was signed and approved by Tardif, Rautenberg and McVey. The plaintiffs further alleged that McVey destroyed her handwritten notes of the June 21, 1999 telephone call and produced, in response to a subpoena, typewritten notes that indicated that during their conversation, Chad Prigge had indicated that he was not certain whether he wanted to pursue custody of Joshua S.

[6] The plaintiffs alleged that they had attempted to visit Joshua S. at the medical center on June 16, 1999, and again on the weekend of June 19 and 20, 1999, but were denied visitation both times. Subsequently, the plaintiffs were allowed to have visitation with Joshua S. in the presence of and under the supervision of department personnel and his temporary foster parents twice a month. When they had requested more visitation, the defendants refused.

[7] The plaintiffs alleged that they were not notified of the June 18, 1999 preliminary hearing on the order of temporary custody. Chad Prigge nevertheless went to the hearing, but was not allowed to enter the hearing room. At that hearing, assistant attorney general Mary Ann Mulholland, representing the department and Ragaglia, informed the court that the department was aware that the wills had named the plaintiffs as guardians of Joshua S., but she told the court that the plaintiffs had indicated that they did not want custody of him. Following the hearing, Mulholland gathered a group of people together to inform them of the results of the hearing, but asked Chad Prigge to leave before she did so. The temporary foster parents of Joshua S. were allowed to stay. No one informed the court that Chad Prigge had appeared that day for the purpose of asserting his rights as testamentary guardian.

tiffs before making the placement decision,[8] and made unfounded allegations against the plaintiffs during a probate proceeding[9] on the contested wills of Charles S. and Kelly S.

The plaintiffs claimed that, in engaging in this alleged misconduct, the defendants acted in excess of the statutory authority granted to them as department officials under General Statutes §§ 45a-596, 17a-3, 17a-15 and 17a-96,[10] and the authority granted to them under article

---

[8] The plaintiffs alleged that, on June 22, 1999, based on Bosse's investigation, McVey placed Joshua S. with a family other than that of the plaintiffs. None of the defendants conducted an inspection of the plaintiffs' home or interviewed them prior to making this decision.

[9] The plaintiffs alleged that, during the proceedings, the defendants characterized the plaintiffs' church as a cult and represented that the plaintiffs improperly used corporal punishment, were not "psychologically-minded," were opposed to medical treatment for themselves and their children, and were unable to maintain contact between Joshua S. and Jessica M. The plaintiffs alleged that the defendants made these representations despite overwhelming evidence to the contrary and despite the defendants' failure to interview the plaintiffs, conduct a home visit with the plaintiffs or inspect the medical records of the plaintiffs or those of the plaintiffs' children.

[10] General Statutes § 45a-596 provides: "(a) The parent of an unmarried minor, except a parent who has been removed as guardian of the person of the minor, may by will or other writing signed by the parent and attested by at least two witnesses appoint a person or persons as guardian or coguardians of the person of such minor, as guardian or coguardians of the estate, or both, to serve if the parents who are guardians of the minor are dead. If two or more instruments, whether by will or other writing, contain an appointment, the latest effective appointment made by the last surviving parent has priority. Such appointment shall not supersede the previous appointment of a guardian made by the court of probate having jurisdiction.

"(b) The ward of such a guardian may, when he or she is over the age of twelve, apply to the court of probate in which such ward resides, for the substitution of a guardian or coguardians of the person to supersede the appointed guardian. The court of probate may, upon such application and hearing, substitute the guardian or coguardians chosen by the ward to be the guardian or coguardians of the person of the ward after consideration of the standards set forth in section 45a-617.

"(c) A parental appointment becomes effective when the guardian's written acceptance is filed in the court in which the nominating instrument is probated, or, in the case of a nontestamentary nominating instrument, in the court for the probate district where the minor resides. Any guardian or coguardians appointed pursuant to this section shall receive the appointment

subject to the control of the court of probate and subject to the provisions and restrictions to which the last surviving parent, as guardian, was subject at the time of such parent's decease. If the court deems it necessary for the protection of the minor, a guardian or coguardians of the person shall furnish a probate bond. A guardian or coguardians of the estate shall furnish a probate bond. Upon such acceptance of guardianship or furnishing such bond, the guardian or coguardians shall have the same power over the person and estate of such minor as guardians appointed by the court of probate."

Although § 45a-596 was amended since 1999, the date of the alleged misconduct here, those changes are not relevant to this appeal. See Public Acts 2000, No. 00-76, § 1. References to § 45a-596 in this opinion are to the current revision of that statute.

General Statutes § 17a-3 provides: "The department shall plan, create, develop, operate or arrange for, administer and evaluate a comprehensive and integrated state-wide program of services, including preventive services, for children and youth whose behavior does not conform to the law or to acceptable community standards, or who are mentally ill, including deaf and hearing impaired children and youth who are mentally ill, emotionally disturbed, substance abusers, delinquent, abused, neglected or uncared for, including all children and youth who are or may be committed to it by any court, and all children and youth voluntarily admitted to the department for services of any kind. Services shall not be denied to any such child or youth solely because of other complicating or multiple disabilities. The department shall work in cooperation with other child-serving agencies and organizations to provide or arrange for preventive programs, including but not limited to teenage pregnancy and youth suicide prevention, for children and youth and their families. The program shall provide services and placements that are clinically indicated and appropriate to the needs of the child or youth. In furtherance of this purpose, the department shall: (a) Maintain the Connecticut Juvenile Training School and other appropriate facilities exclusively for delinquents; (b) develop a comprehensive program for prevention of problems of children and youth and provide a flexible, innovative and effective program for the placement, care and treatment of children and youth committed by any court to the department, transferred to the department by other departments, or voluntarily admitted to the department; (c) provide appropriate services to families of children and youth as needed to achieve the purposes of sections 17a-1 to 17a-26, inclusive, 17a-28 to 17a-49, inclusive, and 17a-51; (d) establish incentive paid work programs for children and youth under the care of the department and the rates to be paid such children and youth for work done in such programs and may provide allowances to children and youth in his custody; (e) be responsible to collect, interpret and publish statistics relating to children and youth within the department; (f) conduct studies of any program, service or facility developed, operated, contracted for or supported by the department in order to evaluate its effectiveness; (g) establish staff development and other training and educational programs designed to improve the quality of depart-

mental services and programs, provided no social worker trainee shall be assigned a case load prior to completing training, and may establish educational or training programs for children, youth, parents or other interested persons on any matter related to the promotion of the well-being of children, or the prevention of mental illness, emotional disturbance, delinquency and other disabilities in children and youth; (h) develop and implement aftercare and follow-up services appropriate to the needs of any child or youth under his care; (i) establish a case audit unit to monitor each region's compliance with regulations and procedures; (j) develop and maintain a database listing available community service programs funded by the department; (k) provide outreach and assistance to persons caring for children whose parents are unable to do so by informing such persons of programs and benefits for which they may be eligible; (l) collect data sufficient to identify the housing needs of children served by the department and share such data with the Department of Economic and Community Development; (m) prepare and submit biennially to the General Assembly a five-year master plan. The master plan shall include, but not be limited to: (1) The long-range goals and the current level of attainment of such goals of the department; (2) a detailed description of the types and amounts of services presently provided to the department's clients; (3) a detailed forecast of the service needs of current and projected target populations; (4) detailed cost projections for alternate means of meeting projected needs; (5) funding priorities for each of the five years included in the plan and specific plans indicating how the funds are to be used; (6) a written plan for the prevention of child abuse and neglect; (7) a comprehensive mental health plan for children and adolescents, including children with complicating or multiple disabilities; (8) a comprehensive plan for children and youth who are substance abusers, developed in conjunction with the Department of Mental Health and Addiction Services pursuant to the provisions of sections 19a-2a and 19a-7; and (9) an overall assessment of the adequacy of children's services in Connecticut. The plan shall be prepared within existing funds appropriated to the department; and (n) prepare a plan to keep children who are convicted as delinquent and will be committed to the Department of Children and Families and placed in the Connecticut Juvenile Training School in such facility for at least one year after their referral to the department, which plan shall include provisions for development of a comprehensive approach to juvenile rehabilitation."

Although § 17a-3 has been amended since 1999, the date of the alleged misconduct here, those changes are not relevant to this appeal. See Public Acts 1999, No. 99-26, §§ 11, 17 and 39. References to § 17a-3 in this opinion are to the current revision of that statute.

General Statutes § 17a-15 provides: "(a) The commissioner shall prepare and maintain a written plan for care, treatment and permanent placement of every child and youth under the commissioner's supervision, which shall include but not be limited to a diagnosis of the problems of each child or youth, the proposed plan of treatment services and temporary placement

first, §§ 3, 8 and 20,[11] and article seventh of the constitu-

and a goal for permanent placement of the child or youth, which may include reunification with the parent, long-term foster care, independent living, transfer of guardianship or adoption. The child's or youth's health and safety shall be the paramount concern in formulating the plan.

"(b) The commissioner shall at least every six months, review the plan of each child and youth under the commissioner's supervision for the purpose of determining whether such plan is appropriate and make any appropriate modifications to such plan.

"(c) Any child or youth or the parent or guardian of such child or youth aggrieved by any provision of a plan prepared under subsection (a) of this section, or by the commissioner's decision upon review under subsection (b) of this section, or any child or youth or the parent or guardian of such child or youth aggrieved by a refusal of any other service from the commissioner to which he is entitled, shall be provided a hearing within thirty days following a written request for the same directed to the commissioner.

"(d) Upon motion of any sibling of any child committed to the Department of Children and Families pursuant to section 46b-129, in any pending hearing held pursuant to subsection (c) of this section, such sibling shall have the right to be heard concerning visitation with, and placement of, any such child.

"(e) Any hearing held pursuant to a request made under subsection (c) or (d) of this section shall be conducted as a contested case in accordance with chapter 54 provided: (1) A final decision shall be rendered within fifteen days following the close of evidence and filing of briefs; and (2) any appeal of a decision pursuant to section 4-183 shall be to the district of the superior court for juvenile matters, where the child is located, as established in section 46b-142."

Although § 17a-15 has been amended since 1999, the date of the alleged misconduct here, those changes are not relevant to this appeal. See Public Acts 2001, No. 01-149, § 2. References to § 17a-15 in this opinion are to the current revision of that statute.

General Statutes § 17a-96 provides: "The institutions having custody of such children and the agencies and persons licensed by authority of sections 17a-90 to 17a-124, inclusive, 17a-145 to 17a-155, inclusive, 17a-175 to 17a-182, inclusive, 17a-185 and 46b-151 to 46b-151g, inclusive, shall make such reports to the Commissioner of Children and Families at such reasonable times and in such form and covering such data as the commissioner directs. The commissioner and his deputy and agents shall supervise the placing of such children in foster homes. The commissioner may place children who have not been properly placed in homes suitable for their care and protection. In placing any child in a foster home, the commissioner shall, if practicable, select a home of like religious faith to that of the parent or parents of such child, if such faith is known or ascertainable by the exercise of reasonable care."

[11] Article first, § 3, of the constitution of Connecticut provides: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right

hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state."

Article first, § 8, of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, provides: "(a) In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger.

"(b) In all criminal prosecutions, a victim, as the general assembly may define by law, shall have the following rights: (1) The right to be treated with fairness and respect throughout the criminal justice process; (2) the right to timely disposition of the case following arrest of the accused, provided no right of the accused is abridged; (3) the right to be reasonably protected from the accused throughout the criminal justice process; (4) the right to notification of court proceedings; (5) the right to attend the trial and all other court proceedings the accused has the right to attend, unless such person is to testify and the court determines that such person's testimony would be materially affected if such person hears other testimony; (6) the right to communicate with the prosecution; (7) the right to object to or support any plea agreement entered into by the accused and the prosecution and to make a statement to the court prior to the acceptance by the court of the plea of guilty or nolo contendere by the accused; (8) the right to make a statement to the court at sentencing; (9) the right to restitution which shall be enforceable in the same manner as any other cause of action or as otherwise provided by law; and (10) the right to information about the arrest, conviction, sentence, imprisonment and release of the accused. The general assembly shall provide by law for the enforcement of this subsection. Nothing in this subsection or in any law enacted pursuant to this subsection shall be construed as creating a basis for vacating a conviction or ground for appellate relief in any criminal case."

Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

tion of Connecticut,[12] and the first and fourteenth amendments to the United States constitution.[13] They alleged wilful, wanton and reckless misconduct on the part of the defendants in violation of 42 U.S.C. §§ 1983, 1985 (3) and 1986, article first, §§ 3 and 20, and article seventh of the constitution of Connecticut, and intentional infliction of emotional distress, seeking both monetary damages[14] and injunctive relief.[15]

The defendants moved to dismiss the plaintiffs' claims for monetary damages against the defendants in their official capacities. The trial court denied the defendants' motion, concluding that *Shay* v. *Rossi,* supra, 253 Conn. 134, and *Antinerella* v. *Rioux,* supra, 229 Conn. 479, stand for the proposition that the doctrine of sovereign immunity is not applicable to a claim for money damages when the plaintiffs have alleged that state officers acted in excess of statutory authority. The defendants claim that the trial court's ruling was improper because it is inconsistent with the well estab-

---

[12] Article seventh of the constitution of Connecticut provides: "It being the right of all men to worship the Supreme Being, the Great Creator and Preserver of the Universe, and to render that worship in a mode consistent with the dictates of their consciences, no person shall by law be compelled to join or support, nor be classed or associated with, any congregation, church or religious association. No preference shall be given by law to any religious society or denomination in the state. Each shall have and enjoy the same and equal powers, rights and privileges, and may support and maintain the ministers or teachers of its society or denomination, and may build and repair houses for public worship."

[13] The first amendment to the United States constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[14] Included in the plaintiffs' claims for monetary damages are punitive and exemplary damages as well as costs and attorney's fees.

[15] The injunctive relief sought by the plaintiffs is to have the department's records relating to the plaintiffs expunged and destroyed.

lished rule that sovereign immunity bars an action seeking monetary damages, even when the plaintiffs have alleged that state officers acted in excess of statutory authority or pursuant to an unconstitutional statute. We agree with the defendants.

As to the plaintiffs' claims for money damages, this issue is controlled by our decision today in *Miller* v. *Egan*, 265 Conn. 301, 329, 828 A.2d 549 (2003), in which we held that the exception to the doctrine of sovereign immunity for actions by state officers in excess of their statutory authority applies only to actions seeking declaratory or injunctive relief, not to actions for money damages. When a plaintiff brings an action for money damages against the state, he must proceed through the office of the claims commissioner pursuant to chapter 53 of the General Statutes, §§ 4-141 through 4-165. Otherwise, the action must be dismissed for lack of subject matter jurisdiction under the doctrine of sovereign immunity. In the present case, the plaintiffs have not received permission from the office of the claims commissioner to bring their claims for money damages against the state. Therefore, the doctrine of sovereign immunity bars those claims.

The judgment of the trial court denying the defendants' motion to dismiss is reversed and the case is remanded to that court with direction to grant the motion and to render judgment dismissing the plaintiffs' claims against the defendants in their official capacities seeking monetary damages.

In this opinion NORCOTT, PALMER and VERTEFEUILLE, Js., concurred.

SULLIVAN, C. J., concurring. I agree with the result reached by the majority opinion. I write separately, however, because, in reaching that result, the majority relies exclusively on the decision in *Miller* v. *Egan*, 265 Conn. 301, 828 A.2d 549 (2003), released today. I joined

Justice Zarella's concurring opinion in that case, in which he disagreed with the majority's method of statutory analysis. To the extent that the majority in this case relies on that analysis in reaching its conclusion, I disagree.